Entered: December 11th, 2023
Signed: December 10th, 2023

**SO ORDERED**



*Maria Ellena Chavez-Ruark*
_____
**MARIA ELLENA CHAVEZ-RUARK**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

In re:

BARBARA ANN KELLY,

     Debtor.

Case Number:  23-12700-MCR
(Chapter 13)

### <u>MEMORANDUM OPINION</u>

The debtor, Barbara Ann Kelly, and her husband, Gregory Brian Myers, and their dilatory and abusive litigation tactics are well known to the Court.  As discussed in more detail below, Ms. Kelly and Mr. Myers have exploited and subverted the bankruptcy process for over eight years.  It is the intention of this Court that they be precluded from doing so any longer.

Before the Court are three motions, all of which request prospective relief based on the alleged bad faith conduct of Ms. Kelly.  The first is a Motion for Relief From the Automatic Stay [Dkt. No. 14][1] (the "<u>NBC Entities' Lift Stay Motion</u>") filed on May 12, 2023, by Naples Property Holding Company, LLC; Naples Beach Club Land Trust Trustee, LLC, as Trustee; Naples Beach Club Phase II and III Land Trust Trustee, LLC, as Trustee; and NBC Club Owner, LLC

---

[1] All references to a docket number in this Memorandum Opinion are to pleadings filed in Ms. Kelly's current bankruptcy case unless otherwise stated.

1

(collectively, the "NBC Entities"). The NBC Entities' Lift Stay Motion requests relief from the automatic stay pursuant to Section 362(d) of the United States Bankruptcy Code (the "Bankruptcy Code")[2] to permit the NBC Entities to fully and finally pursue their legal rights to dispose of all of the matters arising from or relating to litigation in state and federal courts in which Ms. Kelly and Mr. Myers claimed easement rights with respect to real property owned by the NBC Entities (the "Naples Litigation") and to liquidate the NBC Entities' claim for costs awarded against Ms. Kelly and Mr. Myers in connection with the Naples Litigation. The NBC Entities' Lift Stay Motion also requests prospective relief from the automatic stay to pursue the Naples Litigation and their claim for costs in any future bankruptcy case filed by Ms. Kelly without further order of the Court. Ms. Kelly filed an opposition to the NBC Entities' Lift Stay Motion.

The second motion is a Motion for Relief From Automatic Stay and Co-Debtor Stay and Imposition of an Equitable Servitude for Two Years [Dkt. No. 66] ("U.S. Bank's Lift Stay Motion") filed on June 29, 2023, by U.S. Bank N.A., Successor Trustee to Bank of America, N.A., Successor in Interest to LaSalle Bank N.A., as Trustee, on Behalf of the Holders of the WAMU Mortgage Pass-Through Certificates, Series 2007-OA4 Trust, serviced by Select Portfolio Servicing, Inc. ("U.S. Bank"). The motion requests relief from the automatic stay and the co-debtor stay imposed by Section 362(a) and Section 1301(a), respectively, to allow U.S. Bank to exercise its legal rights under applicable law as to the property known as 4505 Wetherill Road, Bethesda, MD 20816, including the right to foreclose. U.S. Bank's Lift Stay Motion also seeks imposition of an equitable servitude with respect to the property for a period of two years so that no bankruptcy petition filed purporting to affect the property shall enact any stay. Mr. Myers,

---

[2] All statutory references in this Memorandum Opinion are to the Bankruptcy Code unless otherwise stated.

claiming to be a co-debtor with respect to U.S. Bank while also claiming he has no liability on the debt to U.S. Bank, filed an opposition to U.S. Bank's Lift Stay Motion.

The third motion pending before the Court is a Motion to Dismiss [Dkt. No. 15] (the "Motion to Dismiss") filed on May 15, 2023, by the NBC Entities. The Motion to Dismiss requests dismissal of this bankruptcy case pursuant to Section 109(e) and requests the imposition of a two-year bar to refiling based on Ms. Kelly's alleged bad faith conduct. Several parties in interest filed joinders or responses in support of the Motion to Dismiss, and Ms. Kelly filed an opposition to the Motion to Dismiss.

In addition, on June 1, 2023, the Court issued an Order Continuing Hearing on Motion for Relief From the Automatic Stay and Setting Combined Hearing on Motion for Relief From the Automatic Stay, Motion to Dismiss, and the Imposition of Prospective Relief [Dkt. No. 38], which, among other things, provided notice to all creditors and alleged parties in interest – including Ms. Kelly and Mr. Myers – that the Court would consider, in connection with the pending motions, whether to impose an equitable servitude with respect to any real property owned and/or occupied by Ms. Kelly or grant other prospective relief.

The motions and the Court's Order – all of which are predicated on Ms. Kelly's bad faith in filing this case and her on-going abuse of the provisions, purpose, and spirit of the Bankruptcy Code – request or contemplate extraordinary relief. As set forth in detail below, extraordinary relief is not only warranted but also necessary to prevent (or, at least, curtail) further prejudice to creditors and parties in interest. For eight years, Ms. Kelly and Mr. Myers have exploited, manipulated, and abused the bankruptcy process to hinder and delay creditors from enforcing their security interests or otherwise pursuing their claims all while forcing those same creditors to incur substantial legal fees to protect their interests in various state and federal courts. Ms. Kelly and

Mr. Myers' pattern of filing bankruptcy cases, lawsuits, and appeals and subsequently abandoning those actions by either dismissing them or failing to meet filing requirements forces creditors to incur even more costs. Ms. Kelly and Mr. Myers have demonstrated a masterful ability to subvert and pervert the bankruptcy and litigation processes and, until now, have enjoyed great success at abusing, harassing, and harming innocent creditors and parties in interest. The relief being granted by the Court is long overdue. For the reasons set forth herein, the Court will grant the NBC Entities' Lift Stay Motion, U.S. Bank's Lift Stay Motion, and the Motion to Dismiss and will impose prospective relief designed to protect creditors and other parties in interest from further bad faith conduct by Ms. Kelly and, to the extent possible, by Mr. Myers.

Specifically, with regard to the NBC Entities' Lift Stay Motion, the Court will enter an order which:

(i)    Modifies the automatic stay for cause pursuant to Section 362(d)(1) to the extent necessary to permit the NBC Entities to fully and finally pursue their legal rights to dispose of all of the matters arising from or relating to the Naples Litigation and to liquidate the NBC Entities' claim for costs awarded against Ms. Kelly and Mr. Myers in connection with the Naples Litigation;

(ii)   Grants prospective relief from the automatic stay pursuant to Section 105(a) so that the automatic stay imposed by Section 362(a) shall not apply to the Naples Litigation in any bankruptcy case filed in any jurisdiction of the United States by Ms. Kelly for a period of four years after the date that the order becomes final and nonappealable;

(iii)  Imposes an equitable servitude pursuant to Section 105(a) with respect to any and all real property in which Ms. Kelly has an ownership and/or possessory interest for a period of four years after the date that the order becomes final and nonappealable;

(iv)   Grants prospective relief from the automatic stay pursuant to Section 105(a) so that the automatic stay imposed by Section 362(a) shall not apply to any real property in which Ms. Kelly has an ownership and/or possessory interest in any bankruptcy case filed in any jurisdiction of the United States by any individual and/or entity asserting an interest in any of the properties for a period of four years after the order becomes final and nonappealable;

(v)    Directs the NBC Entities to record a copy of the order in compliance with applicable state laws governing notices of interests or liens in real property in Collier County, Florida, and authorizes them to record the order in any other

4

jurisdiction in which the NBC Entities believe Ms. Kelly may have an ownership and/or possessory interest in real property;

(vi)     Directs the NBC Entities to file a certification confirming that they have recorded the order as set forth in the preceding paragraph within 14 days of entry of the order; and

(vii)    Waives the stay described in Bankruptcy Rule 4001(a)(3) and makes the order immediately enforceable.

With regard to U.S. Bank's Lift Stay Motion, the Court will enter an order that:

(i)      Modifies the automatic stay for cause pursuant to Section 362(d)(1) to the extent necessary to permit U.S. Bank to exercise its legal rights under applicable law as to the property known as 4505 Wetherill Road, Bethesda, MD 20816, including but not limited to foreclosure against such property;

(ii)     Modifies the co-debtor stay (to the extent it applies) for failure of Ms. Kelly's plan to propose to pay U.S. Bank's debt and to avoid irreparable harm pursuant to Section 1301(c)(2) and (3) to the extent necessary to permit U.S. Bank to exercise its legal rights under applicable law as to the aforementioned property, including but not limited to foreclosure against such property;

(iii)    Imposes an equitable servitude pursuant to Section 105(a) with respect to any and all real property in which Ms. Kelly has an ownership and/or possessory interest for a period of four years after the date that the order becomes final and nonappealable;

(iv)     Grants prospective relief from the automatic stay pursuant to Section 105(a) so that the automatic stay imposed by Section 362(a) shall not apply to any real property in which Ms. Kelly has an ownership and/or possessory interest in any bankruptcy case filed in any jurisdiction of the United States by any individual and/or entity asserting an interest in any of the properties for a period of four years after the order becomes final and nonappealable;

(v)      Directs U.S. Bank to record a copy of the order in compliance with applicable state laws governing notices of interests or liens in real property in Montgomery County, Maryland, and authorizes it to record the order in any other jurisdiction in which it believes Ms. Kelly may have an ownership and/or possessory interest in real property;

(vi)     Directs U.S. Bank to file a certification confirming that it has recorded the order as set forth in the preceding paragraph within 14 days of entry of the order; and

(vii)    Waives the stay described in Bankruptcy Rule 4001(a)(3) and makes the order immediately enforceable.

With regard to the Motion to Dismiss, the Court will enter an order that:

(i)      Dismisses this case with prejudice effective immediately upon entry of the order;

(ii)     Prohibits Ms. Kelly, pursuant to Section 105(a), from filing another bankruptcy case in any jurisdiction of the United States for a period of four years after the date that the order becomes final and nonappealable; and

(iii)    Provides that the filing of a bankruptcy case by Ms. Kelly prior to the expiration of the time set forth in the preceding paragraph will not cause the automatic stay to

become operative and will not, therefore, provide grounds to stop any scheduled foreclosure sale or other court proceeding with respect to any property owned and/or occupied by Ms. Kelly at that time.

Although the relief granted by the Court is extraordinary, Ms. Kelly and Mr. Myers' on-going and largely unfettered abuse and exploitation of the bankruptcy process is far more extraordinary. The relief granted – particularly the equitable servitude, prospective relief from the automatic stay, and four-year bar to refiling – is necessary to allow creditors an opportunity to enforce their rights and pursue their claims without further obstruction and harassment by Ms. Kelly and Mr. Myers. Ms. Kelly and Mr. Myers have demonstrated that they have no intention of using the bankruptcy process for the purpose for which it was intended and that their sole objective is to harass and frustrate creditors. Their actions extend far beyond anything contemplated or tolerated by the Bankruptcy Code or any other applicable law.

## I.   JURISDICTION

The Court has jurisdiction to adjudicate the pending motions pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Rule 402 of the Local Rules of the United States District Court for the District of Maryland. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b).

## II.   BACKGROUND[3]

### A.   Mr. Myers' Bankruptcy Cases

Although Mr. Myers is not a debtor in this bankruptcy case, the Court begins with a brief overview of his four bankruptcy cases because he filed the case that began his and Ms. Kelly's journey through the bankruptcy courts. It is notable that, as a co-owner of real property with Mr.

---

[3] The facts discussed in this Memorandum Opinion are derived from the evidence offered at hearings on July 10, 2023 and August 1, 2023 (*see* Section II.E. below) and from other proceedings in this and other courts.

Myers, Ms. Kelly received the benefit of the automatic stay of Section 362(a) arising in all of Mr. Myers' bankruptcy cases.

### 1.      The First Myers Case, Case No. 15-26033-MCR filed in this Court

Mr. Myers filed his first bankruptcy case in this Court on November 18, 2015 (Case No. 15-26033-MCR) (the "First Myers Case").  He filed the case as a Chapter 11, and on February 22, 2017, the Court granted the United States Trustee's motion to convert the case to Chapter 7 [First Myers Case, Dkt. Nos. 167 and 316].  In its motion to convert, the United States Trustee argued that Mr. Myers had failed to comply with a Court order by failing to propose a disclosure statement reasonably susceptible to approval or a Chapter 11 plan reasonably susceptible to confirmation, Mr. Myers had grossly mismanaged the bankruptcy estate as the result of a direct conflict of interest, and there had been substantial or continuing loss to or diminution of the estate with no reasonable likelihood of rehabilitation.  The Court agreed and converted the case so that a Chapter 7 trustee, an independent third party, could administer the estate.  The First Myers Case remains pending in this Court.

Ms. Kelly has been an active participant in the First Myers Case and has initiated or significantly contributed to frivolous litigation that has overburdened the bankruptcy estate, the Court, and parties in interest for more than eight years.  Ms. Kelly and Mr. Myers filed countless motions, oppositions, and appeals and commenced eight adversary proceedings in connection with the case.  Suffice it to say, Ms. Kelly and Mr. Myers have been unsuccessful in all or nearly all of their efforts to obtain any relief from this Court.

### 2.      The Second Myers Case, Case No. 19-10392-BLS filed in Delaware

On February 27, 2019, Mr. Myers filed a Chapter 13 petition (Case No. 19-10392-BLS) (the "Second Myers Case") in the United States Bankruptcy Court for the District of Delaware (the

"Delaware Bankruptcy Court").  The Delaware Bankruptcy Court dismissed the Second Myers Case for improper venue on March 28, 2019.

### 3.    The Third Myers Case, Case No. 19-17428-LSS filed in this Court

On May 31, 2019, Mr. Myers filed a Chapter 13 petition in this Court (Case No. 19-17428-LSS) (the "Third Myers Case").  The Court granted Mr. Myers' motion to voluntarily dismiss the Third Myers Case on September 9, 2019.

### 4.    The Fourth Myers Case, Case No. 21-00123-FMD filed in Florida

On January 28, 2021, Mr. Myers filed another Chapter 13 petition (Case No. 21-00123-FMD) (the "Fourth Myers Case"), this time in the United States Bankruptcy Court for the Middle District of Florida (the "Florida Bankruptcy Court").  On January 20, 2023, the Florida Bankruptcy Court entered a Memorandum Opinion Denying Confirmation and Dismissing Case [Fourth Myers Case, Dkt. No. 368] (the "Myers Dismissal Memorandum"), and on February 1, 2023, the Florida Bankruptcy Court entered a Supplemental Order Denying Confirmation and Dismissing Case With Prejudice and Notice to State Court Judges and Clerks [Fourth Myers Case, Dkt. No. 380] (the "Myers Dismissal Order").

The Myers Dismissal Memorandum details the procedural history of the case and concludes that "[Mr. Myers'] actions throughout the course of this bankruptcy case demonstrate that he did not file his Chapter 13 case or the Plan in good faith."  Myers Dismissal Memorandum, at p. 12.  The Florida Bankruptcy Court continued:

> [Mr. Myers] did not file the case with the motivation of paying creditors – in fact, he objected to every filed claim in the case; he has demonstrated that he is not sincere in seeking relief under Chapter 13; and he has not shown good faith in dealing with his creditors.  Rather, [Mr. Myers'] actions evidence that his motivation in this case is to delay and frustrate the many parties with whom he is engaged in contentious litigation, some of whom over the course of the last decade.

Myers Dismissal Memorandum, at pp. 12-13.

After considering the record of the case, the Court concluded that Mr. Myers' case "should be dismissed as a bad faith filing" and "in light of [Mr. Myers'] multiple bankruptcy filings, the Court finds it appropriate to dismiss the case with prejudice with a two-year bar against refiling." Myers Dismissal Memorandum, at p. 13. The Myers Dismissal Order prohibits Mr. Myers "from filing another bankruptcy case anywhere in the world prior to January 19, 2025" and directs the Clerk of the Florida Bankruptcy Court "not to accept any bankruptcy petition filed by [Mr. Myers] prior to January 19, 2025." Myers Dismissal Order, at p. 1.

Mr. Myers appealed the Myers Dismissal Order to the United States District Court for the Middle District of Florida (the "Florida District Court") (Case No. 2:23-cv-00143-JES), and on September 12, 2023, the Florida District Court entered an order dismissing Mr. Myers' appeal for failure to prosecute [Case No. 2:23-cv-00143-JES, Dkt. No. 12]. On September 20, 2023, Mr. Myers filed a Notice of Appeal of the Florida District Court's dismissal order [Case No. 2:23-cv-00143-JES, Dkt. No. 16], appealing the order to the United States Court of Appeals for the Eleventh Circuit (the "Eleventh Circuit"). On November 30, 2023, the Eleventh Circuit entered an order dismissing Mr. Myers' appeal for want of prosecution because Mr. Myers failed to file an appellant's brief within the time fixed by the applicable rules [Case No. No. 23-13081-J, Dkt. No. 12]. Therefore, the Myers Dismissal Order is now final.

**B.**     **Ms. Kelly's Prior Bankruptcy Cases**

Ms. Kelly is no stranger to the bankruptcy system either, having filed five bankruptcy cases of her own over the last five years.

1.     **The First Kelly Case, Case No. 18-13244-LSS filed in this Court**

Ms. Kelly filed her first bankruptcy case, a Chapter 13 proceeding (Case No. 18-13244-LSS) (the "First Kelly Case"), in this Court on March 13, 2018.  She filed her bankruptcy schedules and related summary of assets and liabilities in that case on April 11, 2018 [First Kelly Case, Dkt. Nos. 14 and 17].  Ms. Kelly valued her assets at $6,103,395.57, while listing $0.00 in secured debt, $0.00 in priority unsecured debt, and general unsecured debt of an "unknown" amount.

On April 18, 2018, the Chapter 13 trustee filed a motion to dismiss the case [First Kelly Case, Dkt. No. 31], alleging that Ms. Kelly was not eligible to be a Chapter 13 debtor because she exceeded the debt limits set forth in Section 109(e) based on the filed proofs of claim.  U.S. Bank (which claimed to have liens on two different properties) and another creditor filed responses in support of the Chapter 13 trustee's motion [First Kelly Case, Dkt. Nos. 50, 57, and 70], and Ms. Kelly and Mr. Myers filed separate oppositions to the motion [First Kelly Case, Dkt. Nos. 41 and 72].  The Court held a hearing on the motion to dismiss and the related responses on July 10, 2018, and entered an order granting the motion and dismissing the case three days later [First Kelly Case, Dkt. No. 74].

On July 18, 2018 and July 19, 2018, Ms. Kelly and Mr. Myers filed separate motions to reconsider the dismissal of the case [First Kelly Case, Dkt. Nos. 78 and 79], and on July 26, 2018, Ms. Kelly and Mr. Myers filed separate notices of appeal of the order dismissing the case [First Kelly Case, Dkt. Nos. 80 and 81].  On September 11, 2018, the Court entered a memorandum opinion and related order denying the nearly identical motions to reconsider [First Kelly Case, Dkt. Nos. 95 and 96].  The memorandum opinion detailed the deficiencies and omissions with Ms. Kelly's bankruptcy schedules, determined that Ms. Kelly did not exercise proper due diligence in completing her schedules, analyzed the filed claims in the case, and concluded that Ms. Kelly was

not eligible to be a Chapter 13 debtor under Section 109(e).  Thereafter, Ms. Kelly and Mr. Myers withdrew their appeals of the order dismissing the case.

### 2.    The Second Kelly Case, Case No. 18-07142-FMD filed in Florida

Ms. Kelly commenced her second bankruptcy case (Case No. 18-07142-FMD) (the "Second Kelly Case") on August 24, 2018, when she filed a Chapter 13 petition in the Florida Bankruptcy Court.  Ms. Kelly filed the Second Kelly Case while her and Mr. Myers' motions to reconsider were pending in the First Kelly Case.  The Florida Bankruptcy Court dismissed the Second Kelly Case on Ms. Kelly's request on September 10, 2018 – less than a month after it was filed.  Ms. Kelly did not file her bankruptcy schedules or other required documents in the Second Kelly Case.

### 3.    The Third Kelly Case, Case No. 19-24525-LSS filed in this Court

Ms. Kelly filed her third bankruptcy case (Case No. 19-24525-LSS) (the "Third Kelly Case"), on October 30, 2019, upon the filing of a Chapter 13 petition in this Court.  Ms. Kelly filed her bankruptcy schedules in that case on December 5, 2019 [Third Kelly Case, Dkt. No. 15].  She valued her assets at $13,273,474.26, listed no secured or priority debt, and listed unsecured debt totaling $264,689.48.

Despite the representations in Ms. Kelly's schedules, on June 25, 2020, the Court entered an Order to Show Cause Why Chapter 13 Case Should Not be Dismissed Because Debtor Ineligible for Excessive Debt [Third Kelly Case, Dkt. No. 80].  The show cause order stated that, upon a review of the record in the case, it appeared that Ms. Kelly's debts exceeded the debt limitations for a Chapter 13 debtor set forth in Section 109(e).  The show cause order gave Ms. Kelly 14 days to show cause why the case should not be dismissed.  Instead of filing a response to the show cause order, Ms. Kelly filed a motion to voluntarily dismiss the case on July 7, 2020

[Third Kelly Case, Dkt. No. 82].  The next day, the Court entered an order granting Ms. Kelly's motion to dismiss with prejudice pursuant to Section 109(g)(2), thereby barring her from filing another bankruptcy petition for 180 days [Third Kelly Case, Dkt. No. 83].

### 4.        The Fourth Kelly Case, Case No. 23-11566-LSS filed in this Court

Ms. Kelly filed her fourth case (Case No. 23-11566-LSS) (the "Fourth Kelly Case"), on March 8, 2023, with the filing of a Chapter 11 petition in this Court.  Ms. Kelly filed her master mailing matrix with her petition, listing 23 creditors.  Ms. Kelly did not file her bankruptcy schedules with the petition.  On March 10, 2023, two days after Ms. Kelly filed the petition, the Court entered an Order Dismissing Case for Failure to Comply with Local Bankruptcy Rule 1002-1 [Fourth Kelly Case, Dkt. No. 8] because Ms. Kelly failed to file a list of her 20 largest unsecured creditors, as required by Local Bankruptcy Rule 1002-1(a).

On March 22, 2023, Ms. Kelly filed a motion to reconsider the dismissal order [Fourth Kelly Case, Dkt. No. 15].  She did not file the required list of her 20 largest unsecured creditors with the motion.  Instead, the motion argued – incorrectly and without support – that an individual Chapter 11 debtor is not required to file a list of the 20 largest unsecured creditors.  On March 23, 2023, the United States Trustee filed an opposition to the motion to reconsider [Fourth Kelly Case, Dkt. No. 16].  On the same day, the Court entered an order denying the motion to reconsider, explaining that Bankruptcy Rule 1007(d) requires every Chapter 11 debtor to file a list of the 20 largest unsecured creditors.

On April 5, 2023, Ms. Kelly filed a second motion to reconsider the dismissal order [Fourth Kelly Case, Dkt. No. 19], and the next day, she filed a notice of appeal of the orders dismissing the case and denying the first motion to reconsider [Fourth Kelly Case, Dkt. No. 20].  On April 14, 2023, the Court issued a "Court instruction" [Fourth Kelly Case, Dkt. No. 26], stating that it would

defer ruling on the second motion to reconsider in light of Ms. Kelly's appeal of the dismissal order.

On April 18, 2023, Ms. Kelly filed a pleading titled "Emergency Motion" [Fourth Kelly Case, Dkt. No. 28], in which she asked the Court to withdraw the dismissal order entered in the Fourth Kelly Case and grant her a ten-day enlargement of time to file the list of her 20 largest unsecured creditors.  The Court treated the motion as a third motion to reconsider.  Two days later, the Court issued another "Court instruction" [Fourth Kelly Case, Dkt. No. 30], directing Ms. Kelly to serve a copy of the third motion to reconsider on all creditors listed on her master mailing matrix. That same day, Ms. Kelly withdrew the third motion to reconsider.

On June 21, 2023, the United States District Court for the District of Maryland (the "Maryland District Court") entered an order dismissing the appeal of the order dismissing the Fourth Kelly Case and the order denying the first motion to reconsider based on Ms. Kelly's failure to timely file a designation of items to be included in the appellate record and a statement of the issues to be presented on appeal as required by Bankruptcy Rule 8009 [Fourth Kelly Case, Dkt. No. 38].

### C.    Ms. Kelly's Current Bankruptcy Case

#### 1.    Commencement of the case

On April 19, 2023, Ms. Kelly commenced the instant case by filing a Chapter 13 petition [Dkt. No. 1].  Ms. Kelly did not file any required documents with her petition other than a creditor matrix.  Accordingly, on April 20, 2023, the Court issued a Notice of Deadline for Filing Missing Document [Dkt. No. 4], giving Ms. Kelly until May 3, 2023, to file all required documents.  On the same day, the Court issued a Notice of Chapter 13 Bankruptcy Case [Dkt. No. 5], scheduling the meeting of creditors for June 1, 2023, setting June 28, 2023 as the deadline for nongovernmental entities to file a proof of claim, setting October 16, 2023 as the deadline for

governmental entities to file a proof of claim, and setting forth various other deadlines and information relevant to the case.

On May 1, 2023, Ms. Kelly filed a motion requesting a 14-day extension of the deadline to file her required documents [Dkt. No. 11], stating that she needed additional time to complete the documents, she was in the process of engaging counsel to represent her in this case, and she was unavailable because she had been traveling extensively.  Two days later, the Court entered an order granting the motion [Dkt. No. 12], thereby giving Ms. Kelly until May 17, 2023, to file all required documents.  Due to the serial bankruptcy filings by Ms. Kelly, the order contained the following provision:

> DEBTOR IS HEREBY NOTIFIED that failure to complete the required filings within the extended time allowed by this Order may result in dismissal of this case.  **If this case is dismissed it will be with a 180-day bar to refiling pursuant to 11 U.S.C. § 109(g)(1)** [emphasis in original].

### 2.      Schedules of assets, liabilities, income, and expenses

On May 17, 2023, Ms. Kelly filed her bankruptcy schedules [Dkt. No. 19], in which she detailed – under the penalty of perjury – her assets, liabilities, income, and expenses.

In Schedule A/B, Ms. Kelly identifies an ownership interest in five parcels of real property: a single-family home located at 700 Gulf Shore Blvd. N., Naples, FL 34102 (the "Naples Property") with a scheduled value of $15,000,000.00; a single-family home located at 4505 Wetherill Road, Bethesda, MD 20816 (the "Bethesda Property") with a scheduled value of $5,000,000.00; a single-family home located at 147 Silver Laurel Way, Santa Rosa Beach, FL 32459 (the "Silver Laurel Property") with a scheduled value of $2,638,300.00; land located at Lot 13, Seaside 15 Subdivision, XXX Wakula Lane, Santa Rosa Beach, FL 32459 (the "Wakula Lane Property") with a scheduled value of $1,000,000.00; and land located at The Villages at Seagrove PUD, Santa Rosa Beach, FL 32459 (the "Villages Property") with a scheduled value of

"unknown."  Schedule A/B states that Ms. Kelly owns all five properties as tenants by the entireties.

The other most valuable asset on Schedule A/B is listed in response to question 30, which asks a debtor to list "other amounts someone owes you[.]"  In response to this question, Ms. Kelly wrote "Lot 6 sale proceeds owned tenants by the entireties in escrow" with a value of $1,110,247.01 (the "Lot 6 Proceeds").

Schedule A/B contains three addenda:  Addendum A, which lists 15 lawsuits in various courts to which Ms. Kelly is a party and 36 entities and/or individuals against whom she asserts some type of claim; Addendum B, which lists funds totaling $121,608.34 that were deposited into two separate court registries and to which Ms. Kelly claims an ownership interest; and Addendum C, which provides a description of the Villages Property.  Schedule A/B lists assets having a total value of $24,890,805.60.

Schedule C exempts "100% of fair market value, up to any applicable statutory limit" for all of the assets identified on Schedule A/B, including the Lot 6 Proceeds.

Schedule D lists $0.00 in secured claims and refers to Addendum D, which lists all of Ms. Kelly's real property (except the Villages Property) with the following explanations for why she believes there is no "valid secured claim" against any of the properties:

> The Naples Property:  "There is no legally valid secured claim against the Naples Property which is owned by Barbara Ann Kelly and Gregory B. Myers ('Mr. Myers') as tenants by the entireties.  Mr. Myers is not a party to, nor is he otherwise obligated on, any note or mortgage in connection with his interest in the Naples Property.  Further, and without limitation, [U.S. Bank] entered into an agreement in November 2016 (the 'Contract'), and on April 18, 2022, U.S. Bank, citing *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989), argued that the Contract is an 'agreement to settle a legal dispute' and is an enforceable contract in which 'each party agrees to extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract.'  *Id.*  In fact, on May 10, 2022, in the case styled *US Bank National Association, as Trustee for Credit Suisse First Boston CSFB 2005-11 v. Barbara Ann Kelly, et al.,* Case No.: 11-2009-CA-010813,

in the Circuit Court in and for Collier County, Florida, U.S. Bank filed a response acknowledging that Mr. Myers is not a party to the 2005 'original loan documents' (i.e., 'all while *not* being a party to the original loan documents'). (Emphasis original). Thus, by its own admission, U.S. Bank has no interest in the Naples Property which is owned by the Debtor and Mr. Myers as tenants by the entireties."[4]

➢    The Bethesda Property: "Debtor avers there is no valid secured claim against the Bethesda Property. Further, and without limitation, on April 5, 2010, Chase as 'Lender' executed a written loan modification agreement modifying the terms of a Note and Deed of Trust, imposing new obligations on Ms. Kelly (the 'Loan Modification Agreement,' with the Note and the Deed of Trust sometimes collectively referred to as the 'Loan'). On July 14, 2010, Chase acknowledged in writing that Ms. Kelly made all of the required payments under the Loan Modification Agreement. In Maryland, a party 'waives a contractual right by intentionally relinquishing the right or engaging in conduct that warrants the inference that the right has been relinquished.' *La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 213, 958 A.2d 269 (Md. 2008). 'One such situation is where the parties have entered into a new contractual relationship, replacing the agreement that allegedly was breached, with knowledge of the prior breaches.' *Adam v. Wells Fargo Bank, N.A.,* Civ. A. No. LH-09-2387, 2011 3841547, at *15 (D. Md. Aug. 26, 2011) (citing, inter alia, *Edelstein v. Nationwide Mut. Inc. Co.*, 252 Md. 455, 461, 250 A.2d 241 (1969)). After accepting the benefits of the Loan Modification Agreement (i.e., Ms. Kelly's payments), Chase cannot now dispute the validity of the new contractual relationship (i.e., the Loan Modification Agreement). The Loan Modification Agreement is a valid, binding, and enforceable contract between Chase and Ms. Kelly. *Neil v. Wells Fargo Bank, NA*, 596 Fed. App'x 194 (4th Cir. 2014). On March 14, 2013, Chase recorded an Assignment in the land records purportedly assigning its interest in the Deed of Trust to U.S. Bank N.A., successor trustee to Bank of America, NA, successor in interest to LaSalle Bank NA, as trustee, on behalf of the holders of the WaMu Mortgage Pass-Through Certificates Series 2007-OA4 ('U.S. Bank'). The Maryland Rules only allow the use of the 'order-to-docket' procedure (a summary in-rem proceeding) when there is no doubt as to the validity of the loan instruments and the lender has a right to foreclose. *See* Md. Rule 14-207(b) (providing requirements to foreclose). The Maryland Rules do not allow the 'order-to-docket' process to be used where, like here, the Loan was modified by Chase in 2010 via the written Loan Modification Agreement. Under these circumstances, U.S. Bank is required to file a complaint to foreclose, which action 'shall proceed in the same manner as any other civil action.' Md. Rule 14-208(a). However, U.S. Bank did not file a complaint to foreclose. Pursuant to Md. Code Ann. Cts. & Jud. Proc. § 5-101, '[a] civil action at law shall be filed within three years from the date it accrues

---

[4] Specialized Loan Servicing, LLC as Servicing Agent for Credit Suisse First Boston Mortgage Acceptance Corp., CSFB Mortgage-Backed Pass-Through Certificates, Series 2005-11, U.S. Bank National Association, as Trustee, filed a proof of claim asserting a claim secured by a lien against the Naples Property. *See* Section II.C.7. below.

unless another provision of the Code provides a different period of time within which an action shall be commenced.'  Civil actions based in contract, both express and implied, are subject to § 5-101.  *See Balt. City Bd. of Sch. Comers v. Koba Inst., Inc.*, 194 Md. App. 400, 418-19 (2010) (reaffirming implied contracts subject to three-year statute of limitations set out in CJP § 5-101).  Accordingly, any claims in connection with the Loan Modification Agreement are now time-barred by Maryland's three-year statute of limitations."[5]

➢ The Silver Laurel Property:  "There is no legally valid secured claim against the property located at 147 Silver Laurel Way, Santa Rosa Beach, FL 32459."[6]

➢ The Wakula Lane Property:  "There is no legally valid secured claim against the property identified as Lot 13/Seaside 15 Subdivision.  Further, and without limitation, on April 8, 2015, the Debtor and SunTrust Bank entered into a 'Settlement Agreement' pursuant to which Debtor avers the 'Promissory Note' was satisfied and the 'Mortgage' was released."[7]

Schedule E/F states that Ms. Kelly has no priority unsecured creditors and has 47 general unsecured creditors.  Of those 47 general unsecured creditors, all but six are listed as having a claim in the amount of $1.00.  All 47 creditors are listed as having "unliquidated" and "disputed" claims, and 36 are also listed as having "contingent" claims.

Schedule G states that Ms. Kelly is not a party to any executory contracts or unexpired leases.

Schedule H states that Mr. Myers is a co-debtor on three of the general unsecured claims listed on Schedule E/F (*i.e.*, the claims of The Woods Academy for tuition, Michael K. and Susan R. Myers for a loan, and Crew & Crew, P.A. for legal fees, all listed for $1.00 and identified as unliquidated and disputed claims).

---

[5] U.S. Bank filed a proof of claim asserting a claim secured by a lien against the Bethesda Property.  *See* Section II.C.7. below.

[6] No entity filed a proof of claim asserting a secured claim against the Silver Laurel Property by the claims bar date so this statement is undisputed.

[7] No entity filed a proof of claim asserting a secured claim against the Wakula Lane Property by the claims bar date so this statement is undisputed.

Schedule I states that Ms. Kelly and Mr. Myers are both unemployed and receive monthly Social Security benefits totaling $3,498.00 ($1,821.00 per month for Ms. Kelly and $1,677.00 per month for Mr. Myers) along with monthly contributions from relatives of approximately $5,000.00. The combined monthly income is listed as $8,498.00.

Schedule J lists one dependent (a 19-year-old daughter), fails to include any mortgage payments, and identifies various other expenses totaling $7,933.77 per month.[8] Schedule J lists Ms. Kelly's monthly household net income as $564.23.

### 3.    Proposed Chapter 13 plan

On the same day that she filed her bankruptcy schedules, Ms. Kelly filed a Chapter 13 plan [Dkt. No. 23], proposing to pay $150.00 per month for a term of 36 months ($5,400.00 total) and claiming that the plan will pay allowed general unsecured claims in full. Addendum F to the proposed plan lists 15 judicial liens that Ms. Kelly said she intends to avoid either through the proposed plan or by separate motion.

At present, two creditors have filed objections to confirmation of the proposed plan. On May 25, 2023, U.S. Bank filed its objection [Dkt. No. 34], stating that it has a claim against Ms. Kelly that is secured by a deed of trust on the Bethesda Property with prepetition arrears of approximately $1,317,814.32.[9] On June 8, 2023, Specialized Loan Servicing, LLC, as Servicing Agent for Credit Suisse First Boston Mortgage Acceptance Corp., CSFB Mortgage-Backed Pass-Through Certificates, Series 2005-11, U.S. Bank National Association, as Trustee ("Specialized

---

[8] Schedule J includes monthly expenses for real estate taxes ($1,533.77), homeowner's insurance ($400), maintenance and repairs ($650), electricity and gas ($400), and water/sewer and garbage collection ($250) for the Naples Property as well as expenses for the Bethesda Property in the total, nonitemized amount of $2,300. Schedule J does not list or appear to include any mortgage payments for any of Ms. Kelly's real property.

[9] U.S. Bank later filed a proof of claim [Claim No. 8-1], asserting a claim secured by the Bethesda Property in the amount of $2,698,674.36, including prepetition arrearages in the amount of $1,283,051.28.

Loan Servicing"), filed its objection [Dkt. No. 47], stating that it has a claim against Ms. Kelly that is secured by a deed of trust against the Naples Property with a loan balance of approximately $3,512,802.64.[10]

### 4.    Meeting of creditors

On June 5, 2023, Rebecca A. Herr, the Chapter 13 trustee appointed to administer Ms. Kelly's bankruptcy case (the "Chapter 13 Trustee"), entered a notation on the docket [Dkt. No. 40] that Ms. Kelly's meeting of creditors was not held as scheduled because Ms. Kelly requested a continuance and because of "missing Section 521 documents."  On the same day, the Chapter 13 Trustee filed a notice [Dkt. No. 41] continuing the meeting of creditors to June 29, 2023.   On July 11, 2023, the Chapter 13 Trustee made a docket notation [Dkt. No. 79] that the rescheduled meeting of creditors was not held, once again, because of "missing Section 521 documents."[11]  The case docket confirms that the meeting of creditors was not further rescheduled or held.

### 5.    Pay stubs and tax returns

On June 29, 2023, the Chapter 13 Trustee filed a Notice of Non-Compliance and of Possible Dismissal of Case [Dkt. No. 64], informing the Court that Ms. Kelly failed to provide the Chapter 13 Trustee with a copy of pay advices pursuant to Section 521(a)(1)(B)(iv) and Local Bankruptcy Rule 1007-4 and a copy of her Federal income tax return pursuant to Section 521(e)(2)(A).  The notice further advised Ms. Kelly that the Court could dismiss her case if she did not respond within 14 days.

---

[10] Specialized Loan Servicing later filed a proof of claim [Claim No. 11-1], asserting a claim secured by the Naples Property in the amount of $4,102,962.60, all of which allegedly became due prepetition.

[11] By this time, Ms. Kelly had filed her Notice of Voluntary Dismissal [Dkt. No. 76], requesting dismissal of the bankruptcy case, and the Court had held a hearing on the NBC Entities' Lift Stay Motion and Motion to Dismiss.

### 6.    **Request for voluntary dismissal**

On July 7, 2023, the last business day before the continued hearing on the NBC Entities'

Lift Stay Motion and the Motion to Dismiss, Ms. Kelly filed a Notice of Voluntary Dismissal [Dkt.

No. 76], which states "Debtor, Barbara Ann Kelly, pursuant to 11 U.S.C. § 1307(b), requests that

this case be dismissed."  The dismissal of a Chapter 13 case under Section 1307(b) "shall be on

motion filed and served as required by Rule 9013."  Fed. R. Bankr. P. 1017(f)(2).  Accordingly,

the Court treats the Notice of Voluntary Dismissal as a motion to dismiss.  Because the Court is

granting the NBC Entities' Motion to Dismiss, it will deny Ms. Kelly's request for dismissal as

moot.

### 7.    **Filed claims and related objections**

The deadline by which non-governmental creditors were required to file proofs of claim

was June 28, 2023, and the deadline by which governmental creditors were required to file proofs

of claim was October 16, 2023.  The claims register for this case reflects that 14 proofs of claim

were filed by the claims bar dates:

> ➢ Claim No. 1-1 filed by Florida Power & Light asserting a general unsecured claim in the amount of $878.73 for "unpaid electric bills";

> ➢ Claim No. 2-1 filed by the United States Trustee asserting a general unsecured claim in the amount of $250.00 for unpaid Chapter 11 fees relating to the Fourth Kelly Case;

> ➢ Claim No. 3-1 filed by Washington Suburban Sanitary Commission asserting a general unsecured claim in the amount of $10,617.96 for "services performed";

> ➢ Claim No. 4-1 filed by Verizon, by American InfoSource as agent, asserting a general unsecured claim in the amount of $1,132.79 for "services rendered";

> ➢ Claim No. 5-1 filed by Washington Gas asserting a general unsecured claim in the amount of $212.93 for "utility gas bill";

> ➢ Claim No. 6-1 filed by Anastasia Law, P.L. asserting a general unsecured claim in the amount of $45,738.51 for legal services provided to Mr. Myers, payment of which Ms. Kelly personally guaranteed;

➢    Claim No. 7-1 filed by Dunlap Bennett & Ludwig PLLC asserting a general unsecured claim in the amount of $59,547.90 for "legal services";

➢    Claim No. 8-1 filed by U.S. Bank asserting a claim secured by the Bethesda Property in the amount of $2,698,674.36 for "money loaned," including prepetition arrearages in the amount of $1,283,051.28, and attaching a Mortgage Proof of Claim Attachment with a loan payment history, an Adjustable-Rate Note dated March 30, 2007 signed by Ms. Kelly, a Deed of Trust dated March 30, 2007 signed by Ms. Kelly and Mr. Myers, and other related loan documents;

➢    Claim No. 9-1 filed by Seaside Town Council, Inc. asserting a general unsecured claim in the amount of $22,931.66 based on a Consent Order Approving Settlement Agreement between Mr. Myers and Seaside Town Council entered on April 12, 2017 in an adversary proceeding related to the First Myers Case [Adv. Proc. 16-00472-MCR, Dkt. No. 25];

➢    Claim No. 10-1 filed by Pillsbury Winthrop Shaw Pittman LLP asserting a general unsecured claim against Ms. Kelly in the amount of $258,828.62 for "legal services and expenses" incurred in 2016 and 2017 while representing Ms. Kelly;

➢    Claim No. 11-1 filed by Specialized Loan Servicing asserting a claim secured by the Naples Property in the amount of $4,102,962.60 (all allegedly due prepetition) and attaching a Mortgage Proof of Claim Attachment with a loan payment history, a copy of a Fixed Rate Note dated June 30, 2005 with a maturity date of July 1, 2020, a copy of a Mortgage dated June 30, 2005, and other related loan documents (all of which were signed by Mr. Myers as Ms. Kelly's "Attorney in Fact");

➢    Claim No. 12-1 filed by Naples Golf and Beach Club, Inc. ("NGBC") asserting a general unsecured claim in an unliquidated amount for attorneys' fees and costs incurred in connection with the Naples Litigation;

➢    Claim No. 13-1 filed by the NBC Entities asserting a general unsecured claim in an unliquidated amount for costs incurred in connection with the Naples Litigation; and

➢    Claim No. 14-1 filed by Maryland Comptroller of the Treasury asserting a general unsecured claim for unpaid 2014, 2015, and 2017 income taxes in the amount of $62,786.00 and a priority unsecured claim for related penalties and interest in the amount of $56,383.00 (a claim in the total amount of $119,169.00).[12]

---

[12] The Comptroller of the Treasury filed its claim after the hearings on the pending motions but before the claims bar date for governmental entities.

Without including the claims of NGBC and the NBC Entities, whose claims are asserted in an unliquidated amount, the claims total $7,320,945.06 – secured claims of $6,801,636.96, priority unsecured claims of $56,383.00, and general unsecured claims of $462,925.10.

On July 21, 2023, Ms. Kelly filed objections [Dkt. Nos. 86 and 87] to the claims filed by the NBC Entities and NGBC.  Three days later, she filed objections [Dkt. Nos. 89, 90, and 91] to the claims filed by Dunlap Bennett & Ludwig PLLC, Anastasia Law P.L., and Pillsbury Winthrop Shaw Pittman LLP.  Two days after that, Ms. Kelly filed objections [Dkt. Nos. 92, 93, 94, 95, 96, and 97] to the claims of Florida Power & Light, Washington Suburban Sanitary Commission, Verizon, Seaside Town Council, Inc., U.S. Bank, and Specialized Loan Servicing.  The only claims to which Ms. Kelly did not file an objection were the claims filed by the United States Trustee, Washington Gas, and the Maryland Comptroller of the Treasury.  In total, she filed objections to 11 of the 14 proofs of claim filed in her case.

As required by Local Bankruptcy Rule 3007-1, each claim objection contained a notice giving the claimant 30 days to file a response.  However, in light of the pending Motion to Dismiss, the Court entered an order [Dkt. No. 101] on August 3, 2023, extending the response deadline until 30 days after the Court enters an order disposing of the Motion to Dismiss.  The 11 claim objections will become moot when the Court enters the order dismissing this case.

D.    **The Pending Motions**

1.    **The Naples Litigation and the NBC Entities' Lift Stay Motion**

Mr. Myers commenced the Naples Litigation on May 27, 2021, when he filed a complaint against the NBC Entities styled *Myers, et al. v. Naples Golf and Beach Club, Inc., et al.* (Case No. 21-CA-001441-0001) in the Twentieth Judicial Circuit, Collier County, Florida (the "Florida State Court").  Ms. Kelly later joined as a plaintiff.  Through the complaint, Ms. Kelly and Mr. Myers

22

claimed a private implied easement appurtenant to the Naples Property and use restrictions over portions of the NBC Entities' property, a 124-acre tract of land previously known as the Naples Golf and Beach Club and operated as a hotel and golf course (the "NBC Property"). NGBC owned the NBC Property for decades and transferred the NBC Property to the NBC Entities in October 2021. In the NBC Entities' Lift Stay Motion, the NBC Entities claim that Ms. Kelly and Mr. Myers filed a *lis pendens* against the NBC Property in an effort to frustrate and delay the closing of the sale of the NBC Property by NGBC to the NBC Entities. NBC Entities' Lift Stay Motion, at pp. 3-5.

The Florida State Court presiding over the Naples Litigation entered an Amended Summary Final Judgment (the "Final Judgment") on May 6, 2022. Among other things, the Final Judgment rejected Ms. Kelly and Ms. Myers' claims to an implied easement and use restrictions over the NBC Property, denied all relief sought by Ms. Kelly and Mr. Myers, discharged and released the *lis pendens* filed by Ms. Kelly and Mr. Myers, reserved jurisdiction to determine the NBC Entities' damages as a result of the wrongful *lis pendens* filing, permanently enjoined Ms. Kelly and Mr. Myers from claiming any interests whatsoever in the NBC Property, and awarded costs to the NBC Entities. Final Judgment, at pp. 19-20.

The procedural history of the Naples Litigation becomes complicated after the Florida State Court entered the Final Judgment. Ms. Kelly and Mr. Myers appealed the Final Judgment to the Second District Court of Appeal of Florida on June 22, 2022 and again on June 24, 2022, and both appeals were transferred to the newly created Sixth District Court of Appeal of Florida on January 1, 2023. In addition, Ms. Kelly and Mr. Myers removed the appeal to the Florida District Court on November 29, 2022. The Florida District Court granted motions to remand filed by the NBC Entities and NGBC and remanded the proceedings to the Florida court on March 23, 2023.

The Florida District Court thereafter denied Mr. Myers' motion for reconsideration of the remand order on May 10, 2023.  According to the NBC Entities, the pending appeals continue to cloud title to the NBC Property and the cost award to the NBC Entities remains unliquidated.  NBC Entities' Lift Stay Motion, at pp. 2 and 4-5.[13]

On May 12, 2023, the NBC Entities filed the NBC Entities' Lift Stay Motion [Dkt. No. 14], which requests (i) relief from the automatic stay pursuant to Section 362(d) to permit the NBC Entities to fully and finally pursue their legal rights to dispose of all of the matters arising from or relating to the Naples Litigation and to liquidate the NBC Entities' claim for costs awarded against Ms. Kelly and Mr. Myers in connection with the Naples Litigation; and (ii) prospective relief from the automatic stay to permit the NBC Entities to pursue the Naples Litigation and liquidate their claim for costs in any future bankruptcy case filed by Ms. Kelly without further court order.  The NBC Entities self-scheduled a hearing on the NBC Entities' Lift Stay Motion for June 8, 2023.

On June 1, 2023, the Court issued an Order Continuing Hearing on Motion for Relief From the Automatic Stay and Setting Combined Hearing on Motion for Relief From the Automatic Stay, Motion to Dismiss, and the Imposition of Prospective Relief [Dkt. No. 38].  The order, among other things, continued the hearing on the NBC Entities' Lift Stay Motion to June 13, 2023 and provided notice to all creditors and alleged parties in interest that the Court would consider at the next hearing whether to impose an equitable servitude with respect to any real property owned and/or occupied by Ms. Kelly or grant other prospective relief.  The BNC Certificate of Mailing

---

[13] The Court understands that there may have been further proceedings and appeals and there may be other material facts relating to the Final Judgment that are not reflected in the documents in evidence.  (For example, although the Florida state court reserved jurisdiction to determine the NBC Entities' damages as a result of the wrongful *lis pendens* filing, it is not readily apparent to the Court whether damages have been determined or whether the only damages are the unliquidated cost award.)  Although such further proceedings and facts may be material in litigation and appeals relating to the Final Judgment, they are not material to this Court's determination of the NBC Entities' Lift Stay Motion, U.S. Bank's Lift Stay Motion, or the Motion to Dismiss.

[Dkt. No. 39] docketed on June 3, 2023, confirms that a copy of the order was sent to Ms. Kelly at the Bethesda Property address (her address of record in this case) and to Mr. Myers at the Bethesda Property address and the Naples Property address.

On June 12, 2023, Ms. Kelly filed a "preliminary" opposition to the NBC Entities' Lift Stay Motion [Dkt. No. 54]. In the opposition, she challenges the NBC Entities' standing to file a lift stay motion and denies that the NBC Entities are a "party in interest" because they are merely "litigants in a nonbankruptcy forum" with "no monetary stake in the outcome of this bankruptcy case." Opposition to NBC Entities' Lift Stay Motion, at pp. 3-4. Notwithstanding the clear and unambiguous language in the Final Judgment, Ms. Kelly also denies that a final judgment has been entered in the Naples Litigation, denies that the NBC Entities were awarded costs against Ms. Kelly, denies that there is cause to grant relief from the automatic stay, denies that Ms. Kelly filed this case in bad faith, and accuses the NBC Entities of making slanderous accusations against her. Opposition to NBC Entities' Lift Stay Motion, at pp. 4-7.

The Court held an initial hearing to consider the NBC Entities' Lift Stay Motion and related filings on June 13, 2023. At that hearing, Mr. Myers advised the Court that Ms. Kelly was unable to appear at the hearing because she had experienced a medical emergency and requested a 21-day continuance so that he and Ms. Kelly could engage counsel to represent them in the bankruptcy proceeding. In addition, Mr. Myers argued that, as an alleged co-debtor on any debt to the NBC Entities, he is a party in interest entitled to 21 days' notice of the NBC Entities' Lift Stay Motion under Local Bankruptcy Rule 2002-1(a) and that he did not receive adequate notice of the NBC Entities' Lift Stay Motion. To eliminate any notice issues, provide Ms. Kelly an opportunity to appear and be heard, and provide Ms. Kelly and Mr. Myers an opportunity to engage counsel, the Court entered an Order Continuing June 13, 2023 Hearing on Motion for Relief From the

25

Automatic Stay, Motion to Dismiss, the Imposition of Prospective Relief, and Related Matters [Dkt. No. 58].  That order continued the hearing to July 10, 2023 (a 27-day continuance) and set July 6, 2023 as the deadline for parties in interest to file a response to the NBC Entities' Lift Stay Motion and other pending matters.  The BNC Certificate of Mailing [Dkt. No. 59] docketed on June 17, 2023, confirms that a copy of the order was sent to Ms. Kelly at the Bethesda Property address and to Mr. Myers at the Bethesda Property address and the Naples Property address.

On June 14, 2023, the NBC Entities filed a Supplemental Certificate of Service [Dkt. No. 57], which confirms the NBC Entities served a copy of the NBC Entities' Lift Stay Motion on all creditors and alleged parties in interest – including Ms. Kelly and Mr. Myers – on June 13, 2023.

Continuance of the hearing on the NBC Entities' Lift Stay Motion and service of the NBC Entities' Lift Stay Motion on Mr. Myers mooted Mr. Myers' arguments regarding improper notice and service.

### 2.    U.S. Bank's loan to Ms. Kelly and U.S. Bank's Lift Stay Motion

Ms. Kelly executed an Adjustable Rate Note dated March 30, 2007, in favor of Washington Mutual Bank, FA in the principal amount of $1,776,000.00.  She and Mr. Myers executed a Deed of Trust, also dated March 30, 2007, which granted the noteholder a lien on the Bethesda Property securing repayment of the loan.  JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Corporation as receiver of Washington Mutual Bank f/k/a Washington Mutual Bank, FA, assigned the Deed of Trust to U.S. Bank on February 19, 2013.  As of June 23, 2023, the unpaid principal balance of the Note was $1,828,361.45 and the total due under the Note was $2,698,674.36.

On August 29, 2014, U.S. Bank commenced a foreclosure action in the Circuit Court for Montgomery County, Maryland (the "Maryland State Court") styled *Ward, et al. v. Kelly, et al.*,

Case No. 394829V (the "Foreclosure Litigation").  Although the Foreclosure Litigation has been pending for more than nine years, U.S. Bank has been unable to complete a sale of the Bethesda Property because Ms. Kelly and Mr. Myers have filed numerous motions and appeals challenging U.S. Bank's right to foreclose.  Pending nearly as long is Ms. Kelly and Mr. Myers' breach of contract litigation, which relates to a purported 2010 loan modification, filed on February 13, 2015 in the Maryland State Court styled, *Kelly, et al. v. JPMorgan Chase Bank National Association*, Case No. 401247V (the "Contract Litigation").  As in the Foreclosure Litigation, Ms. Kelly and Mr. Myers have vigorously and aggressively litigated the Contract Litigation by filing numerous motions and appeals.[14]  The Foreclosure Litigation and the Contract Litigation have been further hampered by the imposition of the automatic stay imposed in the nine bankruptcy cases filed by Ms. Kelly and Mr. Myers.

On June 29, 2023, U.S. Bank filed U.S. Bank's Lift Stay Motion [Dkt. No. 66], which requests (i) relief from the automatic stay pursuant to Section 362(d) to allow U.S. Bank to exercise its legal rights under applicable law, including its right to foreclose, with respect to the Bethesda Property; (ii) relief from the co-debtor stay imposed by Section 1301(a); (iii) imposition of an equitable servitude with respect to the Bethesda Property for a period of two years pursuant to Sections 105(a) and 362(d)(4) so that no bankruptcy petition filed purporting to affect the Bethesda Property shall enact any stay; and (iv) waiver of the stay imposed by Bankruptcy Rule 4001(a)(3).

U.S. Bank filed a motion to shorten the time for responses and for an expedited hearing [Dkt. No. 67] so that U.S. Bank's Lift Stay Motion could be heard by the Court at the same time

---

[14] The Court understands that there may have been further proceedings and appeals and there may be other material facts relating to the Foreclosure Litigation and Contract Litigation that are not reflected in the documents in evidence.  Although such further proceedings and facts may be material in the Foreclosure Litigation and Contract Litigation, they are not material to this Court's determination of the NBC Entities' Lift Stay Motion, U.S. Bank's Lift Stay Motion, or the Motion to Dismiss.

as the NBC Entities' Lift Stay Motion.  To give Ms. Kelly and Mr. Myers appropriate time to respond and prepare for a hearing, the Court entered an order denying the motion to shorten time and for expedited hearing [Dkt. No. 69].  The Court then issued a notice [Dkt. No. 70] scheduling a hearing on U.S. Bank's Lift Stay Motion for July 27, 2023.  After further consideration and to specially set the hearing for a time when the Court did not have other hearings scheduled, the Court issued an Order Continuing July 27, 2023 Lift Stay Hearing and Continuing Automatic Stay Pending Final Hearing [Dkt. No. 83].  That order rescheduled the hearing for August 1, 2023 and provided that the automatic stay would continue in effect pending a determination on U.S. Bank's Lift Stay Motion notwithstanding Section 362(e).[15]

On August 1, 2023, Mr. Myers, claiming to be a co-debtor with respect to U.S. Bank while also claiming he has no liability on the debt to U.S. Bank, filed an opposition [Dkt. No. 99] to U.S. Bank's Lift Stay Motion, denying the core allegations of the motion and requesting a hearing.  Ms. Kelly did not file an opposition to U.S. Bank's Lift Stay Motion.

### 3.    <u>The Motion to Dismiss</u>

On May 15, 2023, the NBC Entities filed the Motion to Dismiss [Dkt. No. 15], which requests (i) dismissal of this bankruptcy case arguing that Ms. Kelly is not eligible to be a Chapter 13 debtor under Section 109(e); (ii) dismissal for cause under Section 1307 arguing that Ms. Kelly filed this case in bad faith; and (iii) prospective relief in the form of a bar to refiling arguing that Ms. Kelly has acted in bad faith in connection with this case and other proceedings before this Court.

---

[15] Section 362(e) provides that the automatic stay is terminated with respect to a party moving for relief from the stay with respect to an act against property 30 days after the motion is filed unless the court orders that the stay continue in effect pending the conclusion of, or as a result of, a final hearing and determination under Section 362(d).  11 U.S.C. § 362(e)(1).

In support of the Motion to Dismiss, the NBC Entities argue that Ms. Kelly continues to owe "substantially the same creditors whose claims gave rise to the jurisdictional dismissal" of the First Bankruptcy Case, that "the creditor composition of this case does not appear to be materially different than in past cases," that Ms. Kelly filed the Fourth Kelly Case and the Fifth Kelly Case on the eve of foreclosure of the Naples Property by Specialized Loan Servicing, and that Ms. Kelly's and Mr. Myers' serial bankruptcy filings have interfered with and delayed the efforts of creditors to fully and finally conclude their disputes with Ms. Kelly and Mr. Myers.  Motion to Dismiss, at pp. 2-3.  The Motion to Dismiss requests dismissal of this case, arguing that Ms. Kelly is ineligible for Chapter 13 bankruptcy relief because she exceeds the debt limits set forth in Section 109(e) and that Ms. Kelly filed the case in bad faith.  The Motion to Dismiss further requests that Ms. Kelly be barred from filing a new bankruptcy case for a period to run co-terminus with the pending two-year bar imposed against Mr. Myers by the Florida Bankruptcy Court when it dismissed the Fourth Myers Case earlier this year.

Four parties in interest filed responses in support of the Motion to Dismiss.  First, on May 17, 2023, NGBC filed a Joinder in Creditors' Motion to Dismiss [Dkt. No. 18] in which it adopts the arguments set forth in the Motion to Dismiss.

Second, on June 7, 2023, the Chapter 13 Trustee filed the Chapter 13 Trustee's Support of Motion to Dismiss [Dkt. No. 45] in which she requests that the Court dismiss the instant case and impose a bar to refiling.  In addition to the eligibility arguments raised in the Motion to Dismiss, the Chapter 13 Trustee adds that Ms. Kelly's Schedule D (which purports to challenge secured claims asserted in this case) does not shield her from the Chapter 13 debt limits and that dismissal with prejudice is appropriate under the Court's inherent powers to preserve the integrity of the judicial process.

Third, on June 29, 2023, U.S. Bank filed a Joinder in Creditors' Motion to Dismiss [Dkt. No. 68] in which it adopts the arguments set forth in the Motion to Dismiss.  U.S. Bank further argues that it has been prevented from exercising its contractual rights as to the Bethesda Property because of Ms. Kelly's and Mr. Myers' "scheme to delay and hinder [U.S. Bank] through the filing of multiple bankruptcy filings [sic] affecting such real property."  U.S. Bank's Joinder, at p. 1. U.S. Bank requests that the Court dismiss Ms. Kelly's case with prejudice for a period of two years as the Florida Bankruptcy Court did in the Fourth Myers Case.

Finally, on July 6, 2023, Roger Schlossberg, the Chapter 7 trustee appointed in the First Myers Case (the "Myers Chapter 7 Trustee"), filed a Joinder in Creditors' Motion to Dismiss [Dkt. No. 75] in which he adopts and incorporates by reference the arguments set forth in the NBC Entities' Motion to Dismiss and the responses filed by NGBC, the Chapter 13 Trustee, and U.S. Bank.  The Myers Chapter 7 Trustee further asserts that the Lot 6 Proceeds (defined above and discussed in detail below) are not property of Ms. Kelly's bankruptcy estate but are property of the estate in the First Myers Case subject to administration by the Myers Chapter 7 Trustee.  The Myers Chapter 7 Trustee argues that Ms. Kelly's attempt to claim the Lot 6 Proceeds as an asset in her current case is evidence of her bad faith and runs afoul of prior rulings of this Court regarding the Lot 6 Proceeds.  Like the other parties requesting dismissal, the Myers Chapter 7 Trustee requests dismissal with prejudice and a bar to Ms. Kelly refiling any bankruptcy case for a period of two years.

On June 13, 2023, Ms. Kelly filed an opposition [Dkt. No. 55] to the Motion to Dismiss in which she argues – contrary to the well-established law in this jurisdiction – that contingent and unliquidated claims that are subject to a bona fide dispute are not factored into the eligibility analysis.  She asserts that Addendum D to her Schedule D establishes that the claims held by U.S.

Bank and Specialized Loan Servicing are subject to bona fide disputes and are therefore contingent on the outcome of various litigation and remain unliquidated as of the date she filed the instant case.

More specifically, she argues that any claim against the Naples Property is "contingent" because not all events giving rise to any such claim took place prepetition in light of pending litigation in the Florida District Court (Case No. 2:22-cv-00498-JES) (the "SLS Appeal") in which Mr. Myers' has sought to avoid Specialized Loan Servicing's lien against the Naples Property. The Court notes that the referenced litigation is actually an appeal of an Order Denying Debtor's Motion to Reconsider, Alter or Amend Order Denying Motion to Avoid Judicial Lien [SLS Appeal, Dkt. No. 2-2,], which determined that a 2016 consent lift stay order entered by this Court in the First Myers Case did not create a judicial lien and therefore could not be avoided. The appeal was filed in the Florida District Court in connection with the Fourth Myers Case and involves a purported lien on funds being held in this Court's Registry in connection with the First Myers Case, which Mr. Myers asserted was an avoidable judicial lien. The Florida Bankruptcy Court disagreed with Mr. Myers and concluded that Specialized Loan Servicing's interest in the funds is not a judicial lien. Order Denying Debtor's Motion to Reconsider [Fourth Myers Case, Dkt. No. 220]. On September 5, 2023, the Florida District Court issued a 12-page Opinion and Order [SLS Appeal, Dkt. No. 27] affirming the Florida Bankruptcy Court's decision and determining that Specialized Loan Servicing's interest in the subject funds "is more akin to a 'security interest', which is a lien created by agreement." On October 3, 2023, the Florida District Court entered a second Opinion and Order [SLS Appeal, Dkt. No. 30] in which it denied Mr. Myers' motion for reconsideration of its September 5, 2023 decision.

Ms. Kelly's opposition makes a similar argument with respect to claims allegedly secured by the Bethesda Property. She states that any claim allegedly secured by the Bethesda Property is contingent, unliquidated, and disputed because of "a claim objection-lien avoidance action" pending in the Florida District Court (Case No. 2:22-cv-00478-JES) (the "U.S. Bank Appeal"). Again, she fails to state that the pending litigation is actually an appeal of two orders entered by the Florida Bankruptcy Court in the Fourth Myers Case: (i) an Order on Debtor's Motion to Reconsider, Alter or Amend Order on [U.S. Bank's] Motion for Relief From the Automatic Stay and Co-Debtor Stay and Request for Five Year Injunction Against Refiling and Five Years of Prospective Stay Relief as to Real Property [Fourth Myers Case, Dkt. No. 217], which granted U.S. Bank's lift stay motion as to the Bethesda Property (but denied any prospective relief), and (ii) an Order on Debtor's Motion to Reconsider, Alter or Amend Order on Debtor's Objection to Claim 5 Filed By [U.S. Bank] [Fourth Myers Case, Dkt. No. 218], which denied Mr. Myers' objection to U.S. Bank's claim as moot. On September 5, 2023, the Florida District Court issued an 11-page Opinion and Order [U.S. Bank Appeal, Dkt. No. 53] in which it states that Mr. Myers withdrew the appeal of the lift stay order and it affirmed the claim objection order. On October 3, 2023, the Florida District Court entered a second Opinion and Order [U.S. Bank Appeal, Dkt. No. 56] in the same case denying Mr. Myers' motion for reconsideration of the first Opinion and Order.

Mr. Myers appealed the decisions in the SLS Appeal and the U.S. Bank Appeal to the Eleventh Circuit. As of the date of entry of this Memorandum Opinion, the appeals are still pending. Ms. Kelly argues that the ongoing litigation means that all events giving rise to any asserted secured claims in her case did not occur as of the petition date, and therefore, any asserted secured claims remain contingent and unliquidated until the Florida District Court issues its rulings

in the two appeals.  As explained below, Ms. Kelly's dispute of the claims does not render them contingent or unliquidated.

Ms. Kelly's opposition to the Motion to Dismiss adopts and incorporates all the facts and arguments contained in her opposition to the NBC Entities' Lift Stay Motion.  Opposition to Motion to Dismiss, at p. 3.  In her lift stay opposition, she argues that she filed this bankruptcy case in good faith as evidenced by her filing of all required documents, payment of all required fees, and filing of a Chapter 13 plan that proposes to pay allowed, general unsecured claims in full. Opposition to NBC Entities' Lift Stay Motion, at pp. 6-7.

As stated above, the Court went to great lengths to ensure Ms. Kelly and Mr. Myers were provided a full and fair opportunity to be heard on the Motion to Dismiss.  On June 1, 2023, the Court continued the hearing on the Motion to Dismiss to June 13, 2023 and provided notice to Ms. Kelly, Mr. Myers, and all creditors and other parties in interest that the Court would consider at the next hearing whether to impose an equitable servitude with respect to any real property owned and/or occupied by Ms. Kelly or grant other prospective relief.  At the initial hearing on June 13, 2023, Mr. Myers advised the Court that Ms. Kelly was unable to appear at the hearing due to a medical issue and requested a 21-day continuance so that he and Ms. Kelly could engage counsel to represent them in the bankruptcy proceeding.  Mr. Myers also argued that notice of the Motion to Dismiss was not proper because he, as an alleged party in interest, was not served with the Motion to Dismiss or provided 21 days to respond to the Motion to Dismiss.  To eliminate any notice issues, provide Ms. Kelly an opportunity to appear and be heard, and provide Ms. Kelly and Mr. Myers an opportunity to engage counsel, the Court continued the hearing by 27 days to July 10, 2023 and extended the deadline for parties in interest to file a response to the Motion to Dismiss

33

to July 6, 2023.  Again, a copy of the order was sent to Ms. Kelly at the Bethesda Property address and to Mr. Myers at the Bethesda Property address and the Naples Property address.

On June 14, 2023, the NBC Entities filed a Supplemental Certificate of Service [Dkt. No. 57], which confirms the NBC Entities served a copy of the Motion to Dismiss on all creditors and alleged parties in interest – including Ms. Kelly and Mr. Myers – on June 13, 2023.

Mr. Myers' arguments regarding improper notice and service were rendered moot when the Court continued the Motion to Dismiss hearing and the NBC Entities served the Motion to Dismiss on Mr. Myers.

     **E.**      **The Hearings**

          **1.**     **The July 10, 2023 hearing on the NBC Entities'**
                    **Lift Stay Motion and the Motion to Dismiss**

On July 10, 2023, the Court held an evidentiary hearing on the NBC Entities' Lift Stay Motion, the Motion to Dismiss, and pleadings related thereto.  Mr. Myers appeared at the hearing along with attorneys for the NBC Entities, U.S. Bank, Specialized Loan Servicing, the Chapter 13 Trustee, and the Myers Chapter 7 Trustee.   Representatives of the NBC Entities were also in attendance.

At the hearing, the Court was faced with two core issues in considering the NBC Entities' Lift Stay Motion and the Motion to Dismiss.  The first was whether Ms. Kelly's alleged bad faith and abusive conduct warranted the imposition of prospective relief with respect to the Naples Litigation, as requested by the NBC Entities, and/or an equitable servitude with respect to any and all real property in which Ms. Kelly has an ownership and/or possessory interest, as contemplated in the Court's June 1, 2023 Order.  The second was whether this case should be dismissed with a bar to future filings for a period of 180 days under Section 109(g), as argued by Mr. Myers, or whether the dismissal should be subject to a longer bar under Section 105(a) based on Ms. Kelly's

alleged bad faith conduct, as argued by the NBC Entities. Although the Court had granted an almost four week continuance as requested by Mr. Myers so that Ms. Kelly could attend and she and Mr. Myers could engage counsel, Ms. Kelly did not attend the hearing and Mr. Myers appeared at the hearing without representation. According to Mr. Myers, Ms. Kelly did not attend the hearing because she believes she is entitled to the dismissal of this case based on her Notice of Voluntary Dismissal subject only to a 180-day bar to refiling pursuant to Section 109(g).[16]

The NBC Entities offered 15 exhibits into evidence at the hearing. Mr. Myers objected to all of the offered exhibits arguing that they are not relevant, and the Court overruled his objections and admitted all of the exhibits into evidence. The Court provides a brief description of the exhibits offered by the NBC Entities and admitted into evidence:

➢ NBC Entities' Exhibit 1 consists of a copy of the Claims Register in this bankruptcy case.

➢ NBC Entities' Exhibit 2 consists of a chart containing a timeline of bankruptcy filings by Ms. Kelly and Mr. Myers relative to scheduled foreclosure sales, along with copies of the following bankruptcy petitions and dismissal orders filed in Ms. Kelly's and Mr. Myers' prior bankruptcy cases:

➢ The Chapter 13 petition filed by Ms. Kelly in the Florida Bankruptcy Court on August 24, 2018, commencing the Second Kelly Case, and the related order entered by the Florida Bankruptcy Court on September 10, 2018, dismissing the case [Second Kelly Case, Dkt. Nos. 1 and 14];

➢ The Chapter 13 petition filed by Mr. Myers in the Florida Bankruptcy Court on January 28, 2021, commencing the Fourth Myers Case [Fourth Myers Case, Dkt. No. 1]; and

➢ The Chapter 13 petition filed by Mr. Myers in the Delaware Bankruptcy Court on February 27, 2019 commencing the Second Myers Case, a related order entered on March 28, 2019 dismissing the case due to improper venue, an order denying Mr. Myers' motion to reconsider a lift stay order in favor of the United States Trustee, an order denying Mr. Myers' motion to reconsider the dismissal order, and an order denying a motion for stay

---

[16] As discussed in more detail in Section III.C. below, Section 109(g)(2) precludes an individual from being a debtor in bankruptcy if she voluntarily dismissed a bankruptcy case in the preceding 180 days after a party in interest filed a lift stay motion in the case.

pending appeal of the dismissal order [Second Myers Case, Dkt. Nos. 1,24, 44, 45, and 46].

➢   NBC Entities' Exhibit 3 consists of certified copies of various foreclosure pleadings, including:

   ➢   The Notice of Foreclosure Sale issued by the Florida State Court on October 21, 2015, notifying parties that a foreclosure sale of the Naples Property is scheduled for November 19, 2015;

   ➢   The order entered by Maryland State Court in the Foreclosure Litigation on March 12, 2018, denying Ms. Kelly and Mr. Myers' emergency motion for a stay of the foreclosure sale of the Bethesda Property;

   ➢   The Order entered by the Maryland State Court in the Foreclosure Litigation on August 15, 2018, denying Ms. Kelly and Mr. Myers' motion to vacate the order denying their motion to stay and stating that the foreclosure sale of the Bethesda Property may proceed;

   ➢   The Notice of Foreclosure Sale issued by the Florida State Court on January 9, 2019, notifying parties that a foreclosure sale of the Naples Property is scheduled for February 28, 2019;

   ➢   The Notice of Foreclosure Sale issued by the Florida State Court on May 7, 2019, notifying parties that a foreclosure sale of the Naples Property is scheduled for June 3, 2019;

   ➢   The Notice of Foreclosure Sale issued by the Florida State Court on October 4, 2019, notifying parties that a foreclosure sale of the Naples Property is scheduled for October 31, 2019;

   ➢   The Order entered by the Court of Special Appeals of Maryland on November 12, 2020 in which the Court of Special Appeals lifted the stay of Ms. Kelly and Mr. Myers' appeal in the Foreclosure Litigation due to the dismissal of the Third Myers Case and a copy of the related mandate entered the same day;

   ➢   The Notice of Foreclosure Sale issued by the Florida State Court on May 3, 2022, notifying parties that a foreclosure sale of the Naples Property is scheduled for May 26, 2022 pursuant to a Final Judgment of Foreclosure dated September 9, 2015;

   ➢   The Re-Notice of Foreclosure Sale issued on February 22, 2023, notifying parties that a foreclosure sale of the Naples Property is scheduled for March 9, 2023 pursuant to the Final Judgment of Foreclosure dated September 9, 2015; and

> The Re-Notice of Foreclosure Sale issued on March 20, 2023, notifying parties that a foreclosure sale of the Naples Property is scheduled for April 20, 2023 pursuant to the Final Judgment of Foreclosure dated September 9, 2015.

> NBC Entities' Exhibit 4 consists of excerpts from prior decisions issued by various courts determining that Ms. Kelly and/or Mr. Myers acted in bad faith. Exhibit 4 also includes copies of the following:

> > The Memorandum Opinion entered by this Court in the First Kelly Case on September 11, 2018, in which the Court denied two separate emergency motions to reconsider dismissal of the First Kelly Case [First Kelly Case, Dkt. No. 95];

> > A certified copy of the Memorandum Opinion and Order entered by the Maryland District Court on February 1, 2019 in Case No. 8:18-cv-03783-PX, in which the Maryland District Court granted the Myers Chapter 7 Trustee's motion to dismiss an appeal of this Court's order dismissing an emergency motion for accounting and release of alleged exempt property in the First Myers Case because Ms. Kelly and Mr. Myers failed to file an appellate brief [Case No. 8:18-cv-03783-PX, Dkt. No. 10];

> > A certified copy of the Memorandum Opinion and Order entered by the Maryland District Court on March 23, 2022 in Case No. 8:21-cv-001185-GJH, in which the Maryland District Court granted the appellee's motion to dismiss appeals of three orders entered by this Court (an order granting a motion to dismiss an adversary proceeding, an order denying Mr. Myers' motion to vacate filed in the same adversary proceeding, and a memorandum to parties in interest in the First Myers Case regarding the Lot 6 Proceeds) because Ms. Kelly and Mr. Myers failed to designate the record on appeal [Case No. 8:21-cv-001185-GJH, Dkt. No. 83];

> > The Memorandum to Parties in Interest Regarding Entireties and Exemption Issues Previously Litigated issued by this Court in the First Myers Case on April 30, 2021, in which the Court addressed the Lot 6 Proceeds and warned Ms. Kelly and Mr. Myers of possible sanctions if they attempted to relitigate their alleged exemption of the Lot 6 Proceeds [First Myers Case, Dkt. No. 944]; and

> > A certified copy of an order entered by the Maryland District Court on June 21, 2023 in Case No. 8:23-cv-00958-DLB, in which the Maryland District Court dismissed Ms. Kelly's appeal of the order dismissing the Fourth Kelly Case because she failed to timely file a designation of the record and statement of issues on appeal [Case No. 8:23-cv-00958-DLB, Dkt. No. 9].

➢    NBC Entities' Exhibit 5 consists of a chart comparing the assets and liabilities disclosed by Ms. Kelly in her five bankruptcy cases and copies of the bankruptcy schedules filed by her in those cases [Second Kelly Case, Dkt. No. 14; Third Kelly Case, Dkt. No. 15; and Fifth Kelly Case, Dkt. No. 19].

➢    NBC Entities' Exhibit 6 consists of a certified copy of the Myers Dismissal Memorandum entered by the Florida Bankruptcy Court in the Fourth Myers Case on January 20, 2023, in which the Florida Bankruptcy Court determined that the case should be dismissed as a bad faith filing with a two-year bar against refiling, and a Supplemental Order Denying Confirmation and Dismissing Case With Prejudice and Notice to State Court Judges and Clerks entered by the Florida Bankruptcy Court in the same case on February 1, 2023, in which the Florida Bankruptcy Court decrees that the Fourth Myers Case "is dismissed with prejudice effective January 19, 2023, and [Mr. Myers] is prohibited from filing another bankruptcy case anywhere in the world prior to January 19, 2025" [Fourth Myers Case, Dkt. Nos. 368 and 380].

➢    NBC Entities' Exhibit 7 consists of a certified copy of the Final Judgment issued by the Florida State Court in the Naples Litigation, which rejected Ms. Kelly and Ms. Myers' claims to an implied easement and use restrictions over the NBC Property, denied all relief sought by Ms. Kelly and Mr. Myers, discharged and released the *lis pendens* filed by Ms. Kelly and Mr. Myers, reserved jurisdiction to determine the NBC Entities' damages as a result of the wrongful *lis pendens* filing, permanently enjoined Ms. Kelly and Mr. Myers from claiming any interests whatsoever in the NBC Property, and awarded costs to the NBC Entities and NGBC.

➢    NBC Entities' Exhibit 8 consists of a certified copy of a Notice of Appeal of Nonfinal Orders filed by Ms. Kelly and Mr. Myers in the Naples Litigation on June 22, 2022, in which Ms. Kelly and Mr. Myers appealed the Final Judgment.

➢    NBC Entities' Exhibit 9 consists of a certified copy of a Notice of Appeal filed by Ms. Kelly and Mr. Myers in the Naples Litigation on June 24, 2022, in which Ms. Kelly and Mr. Myers appealed the Final Judgment and an order denying their motion for rehearing.

➢    NBC Entities' Exhibit 10 consists of a certified copy of a Notice of Removal filed by Mr. Myers in the Naples Litigation on November 28, 2022, in which Mr. Myers removed the Naples Litigation from the Florida State Court to the Florida District Court.

➢    NBC Entities' Exhibit 11 consists of certified copies of two orders entered by the Sixth District Court of Appeal of Florida on May 18, 2023 in which the court states that it is prevented from taking any action in the appeal due to the automatic stay of Section 362.  Exhibit 11 relates to the appeals in Exhibits 8 and 9 and includes a copy of the docket report in the two pending appeals.  The exhibit also confirms

that Mr. Myers' Notice of Removal admitted as Exhibit 10 was stricken by orders entered on February 2, 2023 and February 13, 2023.

➢ NBC Entities' Exhibit 12 consists of a certified copy of an Opinion and Order entered by the Florida District Court on March 23, 2023, in which the Florida District Court granted the NBC Entities' and NGBC's motions to remand the Naples Litigation to the Florida State Court [Case 2:23-cv-00013-JES-KCD, Dkt. No. 19].

➢ NBC Entities' Exhibit 13 consists of a certified copy of an Opinion and Order entered by the Florida District Court on May 10, 2023, in which the Florida District Court denied Mr. Myers' motion to reconsider the Opinion and Order admitted as Exhibit 12 [Case 2:23-cv-00013-JES-KCD, Dkt. No. 23].

➢ NBC Entities' Exhibit 14 consists of certified copies of the docket reports for the appeal to the Second District Court of Appeal of Florida (Case No. 2D22-2073) of the Final Judgment entered by the Florida State Court in the Naples Litigation, the appeal to the Second District Court of Appeal of Florida (Case No. 2D22-2130) of an order entered by the Florida State Court in the Naples Litigation, and the removal of the Naples Litigation from the Florida State Court to the Florida District Court (Case 2:23-cv-00013-JES-KCD).

➢ NBC Entities' Exhibit 15 consists of a copy of the Second Notice and Order Extending Time to File Summary of Schedules, and/or Chapter 13 Plan, Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income entered by this Court in the Fifth Kelly Case on May 22, 2023, in which Ms. Kelly was given additional time to file the aforementioned documents and notified that, if the documents were not timely filed, the case would be dismissed with a 180-day bar to refiling pursuant to Section 109(g).

The NBC Entities filed an exhibit list and copies of all 15 of their exhibits at Dkt. No. 85.

The Court admitted into evidence all exhibits for which the NBC Entities provided a certified copy and all uncertified opinions, pleadings, and court dockets from this Court. The Court also admitted three exhibits as demonstrative exhibits – the first seven pages of the NBC Entities' Exhibit 2 containing a timeline and summary of bankruptcy filings by Ms. Kelly and/or Mr. Myers relative to pending foreclosure sales, the first two pages of the NBC Entities' Exhibit 4 summarizing prior findings of bad faith conduct attributable to Ms. Kelly and/or Mr. Myers made by various courts, and the first page of the NBC Entities' Exhibit 5 containing a chart comparing the schedules filed in Ms. Kelly's five bankruptcy cases.

The Court has also taken judicial notice of the various proceedings in this Court and other courts. The Court may take judicial notice of docket entries, pleadings, and papers filed in other cases. *In re Marriott Intl., Inc., Customer Data Sec. Breach Litig.*, 543 F. Supp. 3d 96, 133 (D. Md. 2021), *aff'd sub nom. In re Marriott Intl., Inc.*, 31 F.4th 898 (4th Cir. 2022); *Brown v. Ocwen Loan Servicing, LLC*, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 Fed. App'x 200 (4th Cir. 2016). The Court may also take judicial notice of "prior litigation between the same parties where the two cases represent related litigation." *White v. Harris*, 23 F. Supp. 2d 611, 614 (D. Md. 1998) (citing *United States Fidelity & Guar. Co. v. Lawrenson,* 334 F.2d 464, 467 (4th Cir.), *cert. denied*, 379 U.S. 869 (1964)); *see also Cason v. Holder*, 815 F. Supp. 2d 918, 922 (D. Md. 2011), *aff'd,* 464 Fed. App'x 131 (4th Cir. 2012) (unpublished) ("This Court can take judicial notice of its own records in another case … where the two cases represent related litigation.") (citations omitted) and *In re Modanlo*, 342 B.R. 238, 241 (D. Md. 2006) ("Moreover, the Bankruptcy Court is considered 'a unit of the district court' under 28 U.S.C. § 151, and we believe a district court should properly take judicial notice of its own records.") (quoting *Anderson v. Fed. Deposit Ins. Corp.,* 918 F.2d 1139, 1141 (4th Cir. 1990)).

Mr. Myers did not offer any testimony or documents into evidence. At the hearing, Mr. Myers made the following arguments, which will be discussed in greater detail in the analysis section below:

> ➢ Ms. Kelly is entitled to the immediate dismissal of this bankruptcy case subject only to a 180-day bar to refiling based on her filing of the Notice of Voluntary Dismissal;

> ➢ The Court lacks discretion to impose a longer bar to refiling;

> ➢ There has been no bad faith conduct by Ms. Kelly or Mr. Myers with respect to the Lot 6 Proceeds or otherwise;

➢ The Court lacks jurisdiction to consider some arguments presented by the NBC Entities because the Naples Litigation is on appeal, thereby removing jurisdiction from this Court to consider those arguments;

➢ The dismissal of the Fourth Myers Case will be reversed on appeal (presumably thereby negating the findings of bad faith made by the Florida Bankruptcy Court);

➢ The Lot 6 Sale Proceeds were exempt and never became property of the estate in the First Myers Case and were illegally and improperly administered by the Myers Chapter 7 Trustee;

➢ The Court cannot rely on Section 105 if different provisions of the Bankruptcy Code provide for different treatment;

➢ It was prudent for Ms. Kelly to schedule claims as unliquidated, contingent, and/or disputed because Mr. Myer was "hung out to dry" in his bankruptcy case due to "contingent guarantees" and is not indicative of bad faith;

➢ The claims scheduled by Ms. Kelly were properly listed as "unliquidated" due to ongoing litigation regarding those claims in various courts in Florida;

➢ All of the listed creditors on Ms. Kelly's schedules have time-barred claims, have never filed anything against her or contacted her, and have not sought to liquidate their claims; and

➢ Property owned as tenants by the entireties is not property of Ms. Kelly's bankruptcy estate and, therefore, cannot be subjected to an equitable servitude absent the filing of an adversary proceeding.

**2.      The August 1, 2023 hearing on U.S. Bank's Lift Stay Motion**

On August 1, 2023, the Court held an evidentiary hearing on U.S. Bank's Lift Stay Motion and Mr. Myers' opposition thereto. Mr. Myers appeared at the hearing along with attorneys and a representative for U.S. Bank. Again, Ms. Kelly did not attend the hearing.

Sherry Benight, Contested Default Case Manager for Select Portfolio Servicing, testified at the hearing. The Court provides a brief description of the exhibits identified and authenticated by Ms. Benight and admitted into evidence and notes any relevant related testimony by the witness:

➢ U.S. Bank's Exhibit 1 consists of an Adjustable-Rate Note signed by Ms. Kelly and dated March 30, 2007, in favor of Washington Mutual Bank, FA in the principal amount of $1,776,000.00 (the "Note"). Ms. Benight testified that U.S. Bank is the current holder of the Note and Select Portfolio Servicing is the mortgage servicer

for the Bethesda Property.  She also testified that no payments have been made on the Note since February 2010.

➢ U.S. Bank's Exhibit 2 consists of a Deed of Trust signed by Ms. Kelly and Mr. Myers, also dated March 30, 2007, which granted the noteholder a lien on the Bethesda Property securing repayment of the loan.

➢ U.S. Bank's Exhibit 3 consists of an Assignment of the Deed of Trust dated February 19, 2013, from JPMorgan Chase Bank, National Association, successor in interest by purchase from the Federal Deposit Insurance Corporation as receiver of Washington Mutual Bank f/k/a Washington Mutual Bank, FA to U.S. Bank.  Ms. Benight testified that U.S. Bank is the current beneficiary under the Deed of Trust.

➢ U.S. Bank's Exhibit 4 consists of a declaration in support of U.S. Bank's Lift Stay Motion dated July 28, 2023.  According to the declaration, as of June 23, 2023, the unpaid principal balance of the Note was $1,828,361.45 and the total due under the Note was $2,698,674.36.  Ms. Benight confirmed these amounts in her testimony.

➢ U.S. Bank's Exhibit 5 consists of a printout from the State Department of Assessments and Taxation's website for the Bethesda Property.

➢ U.S. Bank's Exhibit 6 consists of a copy of a Consent Order Modifying Relief From Stay entered by this Court in the First Myers Case on June 29, 2017, in which the Court approved an agreement among U.S. Bank, Mr. Myers, and the Myers Chapter 7 Trustee regarding modification of the automatic stay subject to detailed terms and conditions.  According to Ms. Benight's testimony, no payments have been made on account of the Note since February 2010, not even after entry of the order.

➢ U.S. Bank's Exhibit 7 consists of certified copies of the case docket in the Foreclosure Litigation, a motion to stay the foreclosure sale filed by Ms. Kelly and Mr. Myers on February 13, 2015, an order denying the motion to stay entered by the Maryland State Court on September 29, 2015, a motion to reconsider the order denying the motion to stay filed by Ms. Kelly and Mr. Myers on October 9, 2015, and an order denying the motion to reconsider entered by the Maryland State Court on November 4, 2015.

➢ U.S. Bank's Exhibit 8 consists of certified copies of the case docket in the Contract Litigation, a motion for summary judgment and memorandum in support filed by JPMorgan Chase Bank, N.A. on November 20, 2020, and an order granting summary judgment to JPMorgan Chase Bank, N.A. entered by the Maryland State Court on March 11, 2022.

➢ U.S. Bank's Exhibit 10 consists a power of attorney dated May 3, 2013, in which U.S. Bank appoints JPMorgan Chase Bank, N.A. as its attorney-in-fact (identifying the noteholder trust for which U.S. Bank serves as trustee on Schedule A page 5 of 7 attached to the power of attorney), and a power of attorney dated August 5, 2013, in which JPMorgan Chase Bank, N.A. appoints Select Portfolio Servicing as its

attorney-in-fact (identifying the noteholder trust for which U.S. Bank serves as trustee on page 8 of the power of attorney).

U.S. Bank filed an exhibit list and copies of all 10 of its exhibits at Dkt. No. 102.

Mr. Myers objected to the admission of the Note (U.S. Bank's Exhibit 1) on the ground that the Note is a copy instead of the original and to the admission of the declaration and SDAT printout (U.S. Bank's Exhibits 4 and 5) on the ground that they are not certified. The Court overruled Mr. Myers' objections and admitted U.S. Bank's Exhibits 1-8 and 10. The Court did not admit U.S. Bank's Exhibit 9, which is a broker price opinion for the Bethesda Property, because it is hearsay.

Mr. Myers also testified at the hearing and requested that the Court admit two exhibits – an April 5, 2010 letter from Chase Home Finance LLC (Mr. Myers' Exhibit 1) and a July 14, 2010 letter from Chase Homeownership Preservation Office (Mr. Myers' Exhibit 2). Because both letters contain unredacted personal information and redacted copies are attached to U.S. Bank's Exhibit 8, the Court did not admit Mr. Myers' copies of the letters into evidence.[17]

Mr. Myers requested that the Court take judicial notice of his brief (Mr. Myers' Exhibit 3), U.S. Bank's brief (Mr. Myers' Exhibit 4), and his reply brief (Mr. Myers' Exhibit 5) in his appeal of the Florida Bankruptcy Court's order denying his motion to reconsider the order overruling Mr. Myers' objection to U.S. Bank's claim [U.S. Bank Appeal, Dkt. Nos. 36, 43, and 49]. Copies of the briefs are attached to Mr. Myers' Request for Judicial Notice of Adjudicative Facts [Dkt. No. 88] filed in this case. Mr. Myers also requested that the Court take judicial notice of his objection

---

[17] Mr. Myers' copy of the second letter is dated July 14, 2010, and U.S. Bank's copy of the same letter is dated July 21, 2010. The letters are otherwise identical. The Court does not find the date of the letter to be relevant.

to U.S. Bank's claim [Dkt. No. 96] filed in this case (Mr. Myers' Exhibit 6). The Court took judicial notice of the filing of the briefs and claim objection (Mr. Myers' Exhibits 3-6).

Most of Mr. Myers' testimony focused on his belief that U.S. Bank does not have standing to file a lift stay motion. However, he also testified that he and Ms. Kelly have not made any adequate protection payments to U.S. Bank as set forth in the consent lift stay order (U.S. Bank's Exhibit 6), that he and Ms. Kelly have not made any payments on account of the Note since sometime in 2010, and that he and Ms. Kelly never received a copy of the alleged loan modification agreement that is at the heart of their dispute with U.S. Bank. He also admitted that Ms. Kelly would not have attended the hearing even if she did not have medical issues because she believed her filing of a Notice of Voluntary Dismissal had the effect of dismissing her case.

## III.    ANALYSIS

As is often stated, "the principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) (quoting *Grogan v. Garner,* 498 U.S. 279, 286-87 (1991)). This is a universal principle applicable to all bankruptcy cases regardless of what chapter of the Bankruptcy Code a debtor is proceeding under. In a Chapter 13 case, the debtor is afforded the opportunity to obtain this "fresh start" after the successful completion of a payment plan approved by the Court. *Marrama*, 549 U.S. at 367. The purpose behind Chapter 13 was discussed in *In re Miller*, 462 B.R. 421 (Bankr. E.D.N.Y. 2011):

> Under the Bankruptcy Code as first enacted in 1978, an individual or married couple with regular income could seek bankruptcy relief under chapter 13, often called the wage earner's provision; such wage earners, however, could not owe secured or unsecured debts that exceed certain limits, or they would be ineligible for chapter 13 relief. *See* 11 U.S.C. § 109(e). Through chapter 13, Congress sought to strike a balance between a consumer's need for bankruptcy protection and the rights of creditors to receive payments on their

> claims from those who could afford to make at least some payments, and to create a balance between homeowners and mortgage lenders. In addition, chapter 13 provides the debtor benefits not available in chapter 7, such as an ability to restructure certain mortgage and tax liabilities, but detriments such as making post-petition earnings property of the bankruptcy estate.

*Id.* at 426.

In *Marrama*, the United States Supreme Court (the "Supreme Court") considered whether a debtor who acts in bad faith prior to, or in the course of, filing a Chapter 13 petition forfeits his or her right to obtain Chapter 13 relief. In doing so, the Supreme Court concluded that an individual will not qualify for relief under Chapter 13 if the individual exceeds the debt limits set forth in Section 109(e) or if the individual engaged in prepetition bad faith conduct:

> There are at least two possible reasons why Marrama may not qualify as such a debtor, one arising under § 109(e) of the Code, and the other turning on the construction of the word "cause" in § 1307(c). The former provision imposes a limit on the amount of indebtedness that an individual may have in order to qualify for Chapter 13 relief. More pertinently, the latter provision, § 1307(c), provides that a Chapter 13 proceeding may be either dismissed or converted to a Chapter 7 proceeding "for cause" and includes a nonexclusive list of 10 causes justifying that relief. None of the specified causes mentions prepetition bad-faith conduct (although paragraph (10) does identify one form of Chapter 7 error—which is necessarily prepetition conduct—that would justify dismissal of a Chapter 13 case). Bankruptcy courts nevertheless routinely treat dismissal for prepetition bad-faith conduct as implicitly authorized by the words "for cause." See n. 1, *supra*. In practical effect, a ruling that an individual's Chapter 13 case should be dismissed or converted to Chapter 7 because of prepetition bad-faith conduct, including fraudulent acts committed in an earlier Chapter 7 proceeding, is tantamount to a ruling that the individual does not qualify as a debtor under Chapter 13. That individual, in other words, is not a member of the class of "'honest but unfortunate debtor[s]'" that the bankruptcy laws were enacted to protect. *See Grogan v. Garner,* 498 U.S., at 287, 111 S.Ct. 654. The text of § 706(d) therefore provides adequate authority for the denial of his motion to convert.

*Marrama*, 549 U.S. at 372–74.

In this case, the Motion to Dismiss argues that Ms. Kelly does not qualify for relief under Chapter 13 because she is not eligible to be a Chapter 13 debtor under Section 109(e) and because her prepetition conduct constitutes cause for dismissal under Section 1307(c).  The NBC Entities' Lift Stay Motion and U.S. Bank's Lift Stay Motion argue that they should be granted relief from the automatic stay imposed by Section 362(a) and that prospective relief should be granted under Section 105(a) because Ms. Kelly has a long, protracted history of acting in bad faith and with an intent to hinder and delay creditors.

### A.    The NBC Entities' Standing

Ms. Kelly challenges some or all of the NBC Entities' standing to file the NBC Entities' Lift Stay Motion and the Motion to Dismiss.  Her challenge fails.

The Bankruptcy Code defines the term "claim" as: "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]"   11 U.S.C. § 101(5).   The Bankruptcy Code defines the term "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor[.]"  11 U.S.C. § 101(10a). Based on these definitions, it cannot be reasonably disputed that the NBC Entities hold an unliquidated claim for costs under the Final Judgment and are creditors in this bankruptcy case. Because a disputed claim falls within the definition of "claim," Ms. Kelly's dispute of the Final Judgment does not deprive the NBC Entities of standing.

Moreover, to have standing to file a lift stay motion, "the Movant must establish that it holds a sufficient-enough right, *i.e.,* a colorable claim, that it should be allowed to seek stay relief in order to assert those rights in state court."  *In re Bird*, No. 21-11271-TJC, 2022 WL 829105, at *4 (Bankr. D. Md. Feb. 18, 2022).  The bankruptcy court considering the lift stay motion need not

determine the merits of any objections the debtor may have to a foreclosure or other state court proceeding. Rather, that task is left to the state court. "[I]t is the court that has jurisdiction over the foreclosure process that ultimately must be satisfied the Movant has the right to pursue and obtain the underlying relief." *Id.* The inquiry for a bankruptcy court considering standing to file a lift stay motion is whether the movant has "a sufficient-enough right" to be able to return to state court to litigate with the debtor. *Id.*

The NBC Entities have offered evidence that they are parties to the Naples Litigation with Ms. Kelly and Mr. Myers in Florida and hold an unliquidated claim for costs under the Florida State Court's Final Judgment. They have demonstrated that they hold a colorable claim against Ms. Kelly, and that claim should be liquidated by the Florida State Court which awarded the claim to the NBC Entities. Therefore, the NBC Entities have standing as parties in interest to request relief from the automatic stay and dismissal of the case. *See* 11 U.S.C. § 362(d) (stating the court shall grant relief from the stay under certain circumstances on the request of a "party in interest") and 11 U.S.C. § 1307(c) (stating the court may convert or dismiss a case on the request of a "party in interest").

**B.    Dismissal for Lack of Chapter 13 Eligibility Under Section 109(e)**[18]

**1.    Standard for Chapter 13 eligibility**

Chapter 13 is only available to individuals with regular income that owe noncontingent, liquidated debts of less than $2,750,000.00 as of the petition date. 11 U.S.C. § 109(e). The purpose of setting a debt limitation was to "permit the small sole proprietor, for whom a chapter 11

---

[18] An analysis of whether Ms. Kelly exceeds the Chapter 13 debt limitations set forth in Section 109(e) may be unnecessary based on her request to voluntarily dismiss this case. Nevertheless, the NBC Entities raise the issue in the Motion to Dismiss and the eligibility analysis highlights Ms. Kelly's bad faith in filing this case. Moreover, Ms. Kelly has a pattern of filing and withdrawing pleadings so the Court includes this analysis in the event she subsequently withdraws her request for voluntary dismissal.

reorganization is too cumbersome a procedure, to proceed under chapter 13." *In re Balbus*, 933

F.2d 246, 251 (4th Cir. 1991) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 321 (1977),

*reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 6277)).  As explained by the United

States Bankruptcy Court for the District of Massachusetts:

> Section 109(e) was part of the first iteration of the Bankruptcy Code
> enacted by the Bankruptcy Reform Act of 1978.  Congress intended
> to extend Chapter 13 relief under the Code beyond "wage earners"
> to self-employed individuals including sole proprietors (i.e., "mom
> and pop" businesses) who were previously limited to the
> cumbersome Chapter XI reorganization under the Bankruptcy Act
> of 1898.  *See* H.R. Rep No. 95–595, at 119 (1977), 1978
> U.S.C.C.A.N. 5963.  Section 109(e) was initially intended to
> function as a gatekeeper, determining which proprietors were small
> enough to reorganize under Chapter 13 and which had to file for
> Chapter 11 relief, where they would have to comply with more
> exacting requirements.  *See id.* ("The limits create an irrebuttable
> presumption that Chapter 13 is inappropriate for businesses with
> more than $100,000 in unsecured debt or more than $500,000 in
> secured debt.").  When Congress raised the Chapter 13 debt limits
> in 1994, it articulated a further purpose of § 109(e) as "help[ing to]
> encourage individual debtors to elect chapter 13 repayment over
> chapter 7 liquidation."  *See* 140 Cong. Rec. H 10,764 (daily ed.
> Oct. 4, 1994) *appearing in 1 Collier on Bankruptcy* App. Pt. 9–74
> (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Although
> Congress intended qualifying business and consumer debtors to
> reorganize under Chapter 13, the eligibility limits of § 109(e) should
> be strictly construed.  *See In re Soderlund,* 236 B.R. 271, 274 (9th
> Cir. B.A.P. 1999).

*In re Rios*, 476 B.R. 685, 687–88 (Bankr. D. Mass. 2012).

Prior to June 21, 2022, an individual (or an individual and such individual's spouse) with

regular income was eligible for relief under Chapter 13 if her noncontingent, liquidated, unsecured

debts totaled less than $465,275.00 and her noncontingent, liquidated, secured debts totaled less

than $1,395,875.00.  1 Norton Bankr. L. & Prac. 3d § 17:12.  Although a debtor's bankruptcy

schedules indicate which debts are considered to be secured or unsecured and the amount of each

debt, the ultimate determination and classification of claims can be a time-consuming process.  *Id.*

"For this reason, the 2022 amendments to Code § 109(e), which combined secured and unsecured debts for purposes of eligibility, was welcomed." *Id.*[19]

The standard for a "noncontingent" debt and a "liquidated" debt is well-settled in this jurisdiction. This Court recently analyzed the terms "noncontingent" and "liquidated" in determining a debtor's eligibility for relief under Chapter 13 in two separate cases – *In re Parking Management., Inc.*, 620 B.R. 544 (Bankr. D. Md. 2020) and *In re Ibbott*, 637 B.R. 567 (Bankr. D. Md. 2022). Although *Parking Management* involved an eligibility determination for a corporate debtor in a Chapter 11, Subchapter V case, it relied on and adopted case law examining a Chapter 13 debtor's eligibility under Section 109(e) and defines the terms "noncontingent" and "liquidated" as used in that section. This Court applied the legal principles espoused in *Parking Management* regarding a debtor's eligibility for Chapter 13 relief to its analysis in *Ibbott*, which addressed the eligibility of a debtor in a Chapter 13 case with judgments that the debtor characterized as "contingent" and "unliquidated" because the judgments were not yet final.

As explained in *Parking Management* and restated in *Ibbott,* the Chapter 13 eligibility analysis requires the Court to consider the entire record in a case in its determination of whether a debt is contingent and/or unliquidated, neither placing total reliance on a debtor's characterization of debt nor unquestionably relying on a creditor's proof of claim. *Parking Mgmt.*, 620 B.R. at 550. "[T]o do so would place eligibility in control of either the debtor or the creditor." *Id.* (citing *In re Madison*, 168 B.R. 986, 989 (D. Haw. 1994)). Instead, as explained in *Parking Management*:

> "At a hearing on eligibility, the court should thus, canvass and review the debtor's schedules and proofs of claim, as well as other evidence offered by a debtor or the creditor to decide only whether the good faith, facial amount of the debtor's liquidated and non-contingent debts exceed statutory limits." *Barcal v. Laughlin (In re*

---

[19] The dollar amount set forth in Section 109(e) is adjusted every three years to reflect changes in the Consumer Price Index. 11 U.S.C. § 104.

> *Barcal)*, 213 B.R. 1008, 1015 (8th Cir. B.A.P. 1997).  Further, a
> bankruptcy court can "scrutinize and redesignate the
> characterization by a debtor of any given debt when that
> characterization is the subject of a case or controversy." *In re Stern*,
> 266 B.R. 322, 326 (Bankr. D. Md. 2001); *see also In re Kelly*, No.
> 18-13244-WIL, 2018 WL 4354653, at *5 (Bankr. D. Md. Sept. 11,
> 2018) (Bankruptcy court can review a debt scheduled as "unknown"
> or "unliquidated" when it appears to a legal certainty to be owed in
> an amount other than what the debtor maintains.); *In re De Jounghe*,
> 334 B.R. 760, 768 (1st Cir. B.A.P. 2005).

*Parking Mgmt.*, 620 B.R. at 550-51.

*Parking Management* defined "noncontingent" debts as follows:

> Noncontingent debts are those where "all events necessary to give
> rise to liability take place prior to filing the petition."  *In re Green,*
> 574 B.R. 570, 576–77 (Bankr. E.D.N.C. 2017) (cleaned up); *see In
> re Aparicio,* 589 B.R. 667, 674-75 (Bankr. E.D. Cal. 2018) (all
> events that triggered liability occurred prepetition).  A debt is
> deemed contingent if liability relies on a future extrinsic event which
> may never occur.  *Id.* at 577 (quoting *In re Hanson,* 275 B.R. 593,
> 596 (Bankr. D. Colo. 2002)) (quoting *In re Nesbit,* No. 99-
> 28414JKF, 2000 WL 294834 at *2 (Bankr. W.D. Pa. March 16,
> 2000)).  Contingent liabilities therefore are a class of liabilities in
> which the obligation to pay does not arise until the occurrence of a
> "triggering event or occurrence ... reasonably contemplated by the
> debtor and creditor at the time the event giving rise to the claim
> occurred."  *In re Barcal*, 213 B.R. at 1013 (cleaned up).

*Id.* at 552.

*Parking Management* analyzed the question of whether debts are classified as contingent

or noncontingent as of the petition date or some other date by "delv[ing] into the extent to which

courts take into account post-petition events when making an eligibility determination, at least in

Chapters 12 and 13."  *Id.* at 554.  The Court noted that "many post-petition actions could result in

contingent claims becoming noncontingent after the case is filed" and determined that the

characterization of a debt as contingent or noncontingent must be made as of the petition date.  *Id.*

The Court continued:

Numerous events may occur postpetition to affect a debtor's total secured or unsecured debt. Collateral may be liquidated, converting a secured claim to an unsecured deficiency claim. Contingent personal guaranties may be liquidated after the creditor pursues a co-debtor, surety, or principal. A creditor may file a postpetition claim treated under the Code as prepetition, such as a lease rejection claim under § 365(g) or a § 1305 claim. Or, as was the case here, a judgment might be modified or vacated by the trial court that issued the judgment later on appeal.

The majority of courts that have considered the effect of a postpetition event on eligibility to file (or be converted) to Chapter 13 have concluded that postpetition events should not be considered in determining eligibility. To hold otherwise would mean that a debtor could float in and out of Chapter 13 eligibility during the course of a case, depending on what happens, which of course makes no legal or practical sense.

The ... plain language of § 109(e) requires consideration of the debts as they exist as of the petition date, irrespective of postpetition events. *E.g., In re Wiencko*, 275 B.R. 772 (Bankr. W.D. Va. 2002); *In re Slack*, 187 F.3d 1070 (9th Cir. 1999); *In re Snell*, 227 B.R. 127 (Bankr. S.D. Ohio 1998); *In re Harwood*, 519 B.R. 535, 539–40 (Bankr. N.D. Cal. 2014); *In re Pearson*, 773 F.2d 751, 758 (6th Cir. 1985) ("[T]he fact that some later resolution of the conflict might render more certain the precise nature of the debt itself ... is relatively immaterial in determining the debtors' financial condition and Chapter 13 eligibility on the date the petition is filed.... We do not believe that the statute requires any more" than a realistic look at "the state of the debtors' affairs" on the petition date).

*Id.* at 554.

*Parking Management* also defined "liquidated" debts:

The Bankruptcy Code does not define the term "liquidated." Again, borrowing from Chapter 13 cases, the concept of a liquidated debt relates to the amount of liability, not the existence of liability. *United States v. Verdunn*, 89 F.3d 799 (11th Cir. 1996). Courts generally hold that "the key factor in distinguishing liquidated from unliquidated claims is not the extent of the dispute nor the amount of evidence required to establish the claim, but whether the process for determining the claim is fixed, certain, or otherwise determined by a specific standard." *In re Barcal*, 213 B.R. at 1014. *See In re Adams*, 373 B.R. 116, 119-120 (10th Cir. B.A.P. 2007) (a "debt is readily determinable only if the process of determining the claim is fixed, certain, or otherwise determinable by a specific standard").

> See *In re Slack*, 187 F.3d at 1073 ("debt is liquidated for the purposes of calculating eligibility for relief under § 109(e) if the amount of the debt is readily determinable."); *In re Stern*, 266 B.R. 322 (quoting and adopting *In re Barcal*, 213 B.R. at 1014, to determine that debts were fixed amounts due pursuant to a contract).

*Parking Mgmt.*, 620 B.R. at 559.

    *Parking Management* and *Ibbott* are instructive and, for the reasons discussed below, compel the conclusion that Ms. Kelly is not eligible to be a Chapter 13 debtor.[20]

### 2.    Ms. Kelly's failure to exercise reasonable diligence and good faith in completing her schedules

    This is not the first time the Court has undertaken a Chapter 13 eligibility analysis with respect to Ms. Kelly. Just five years ago, in the First Kelly Case, the Court issued a 17-page memorandum opinion [First Kelly Case, Dkt. No. 95] discussing the application of Section 109(e) and concluding that Ms. Kelly was not eligible to be a Chapter 13 debtor at that time. Although her financial condition is similar now to what it was then, she filed a petition for relief under Chapter 13 to commence this case. As stated in the 2018 memorandum opinion:

> [T]he starting point of the bankruptcy court's eligibility analysis is the debtor's schedules. *See* [*In re Rios*, 476 B.R. 685, 688 (Bankr. D. Mass. 2012)]. However, where it appears the debtor did not exercise reasonable diligence or good faith in completing and filing his/her schedules, and an objection to eligibility is raised, the bankruptcy court may look to other evidence to determine eligibility, including post-petition events and filed claims. *See id.*; *see also In re Marrama*, 345 B.R. 458, 468-469 (Bankr. D. Mass. 2006). Moreover, a bankruptcy court can "scrutinize and redesignate the characterization by a debtor of any given debt when that characterization is the subject of a case or controversy," such as when a debtor schedules a claim as "unknown" or "unliquidated" but it appears to a legal certainty that the amount owed is other than what the debtor maintains. *In re De Jounghe*, 334 B.R. 760, 768 (1st Cir. B.A.P. 2005); *see also In re Stern*, 266 B.R. 322, 326 (Bankr D. Md. 2001). A debtor cannot circumvent the Chapter 13

---

[20] *Ibbott* adopted the definitions of "noncontingent" debts and "liquidated" debts articulated in *Parking Management* and quoted heavily from that decision.

> eligibility limitations by ignoring what she knows and/or failing to conduct minimal due diligence and instead, listing claims as "unknown." *See Matter of Redburn*, 193 B.R. 249, 256 (Bankr. W.D. Mich. 1996). "To decide otherwise would eviscerate the chapter 13 eligibility requirements." *Id.*

*In re Kelly*, 18-13244-WIL, 2018 WL 4354653, at *5 (Bankr. D. Md. Sept. 11, 2018).

Despite the passage of several years and three intervening bankruptcy filings, much of the analysis from the memorandum opinion issued in the First Kelly Case applies here, particularly the following legal and factual findings:

> The circumstances of this case required the Court to look beyond Kelly's filed schedules to determine her eligibility for Chapter 13 for two reasons. First, the Court does not find that Kelly used reasonable diligence in completing her schedules in light of the numerous creditors listed with claims in "unknown" amounts. These claims could have been determined with minimal effort by Kelly, particularly when she was given additional time to file her schedules. Second, the enormous disparity between the filed claims in this case and the claims scheduled by Kelly required the Court to look past her schedules once the eligibility issue was raised. As set forth above, it would eviscerate the Chapter 13 eligibility requirements if a court could only consider a debtor's schedules regardless of their completion and apparent inaccuracies. Here, Kelly's Schedule D indicates that she has no secured creditors, yet the Secured Claims filed in her case total $6,204,504.52. Similarly, Kelly's Schedule E/F indicates unsecured claims totaling $297,021.00, with eight claims listed in "unknown" amounts, yet the Unsecured Claims filed in this case prior to its dismissal total $1,057,037.89. This Court's analysis could not be restricted solely to Kelly's schedules in light of the substantial discrepancies between her schedules and the filed proof of claims, particularly when several creditors with "Unknown" claims filed claims in set amounts.

*Id.*

Although the bankruptcy schedules filed in the instant case do not list claims with "unknown" amounts as did the schedules in the First Kelly Case, Ms. Kelly simply replaced "unknown" with the amount of $1.00, presumably to attempt to overcome the eligibility hurdle. According to Ms. Kelly's Schedules D and E/F – executed under penalty of perjury – the claims

against Ms. Kelly total $5,169.73. Despite her characterization of the claims, 14 creditors filed proofs of claim in this case totaling $7,320,945.06 (not including the claims of NGBC and the NBC Entities, whose claims are asserted in an unliquidated amount).

The Court finds that Ms. Kelly failed to use a modicum of due diligence – let alone reasonable due diligence – in completing her schedules. *See De Jounghe v. Mender (In re De Jounghe)*, 334 B.R. 760, 768 (1st Cir. B.A.P. 2005) ("As long as a debtor's schedules are completed after the exercise of due diligence and are filed in good faith, the schedules will determine a debtor's eligibility for Chapter 13."). Frankly, the Court finds it impudent that Ms. Kelly failed to list every claim included on Schedule E/F with any degree of accuracy. As with all of her prior bankruptcy cases, Ms. Kelly was given additional time to prepare and file her schedules in this bankruptcy case, yet she still listed 41 of the 47 creditors as having a claim of $1.00 with five of the remaining six claims listed as estimates.

Ms. Kelly could have determined the vast majority (if not all) of the listed claims with minimal effort. The amounts owed to Pepco Holdings, Inc., Washington Suburban Sanitary Commission, and Washington Gas, and the four scheduled claims owed to taxing authorities (City of Naples, the Comptroller of Maryland, Collier County Tax Collector, and the Taxing Authority of Montgomery County) could have been ascertained by reviewing recent bills or online account information. The 12 claims listed for "legal fees" owed to various law firms are undoubtedly readily determinable by reviewing court orders, proofs of claim filed in prior cases, billing statements, and/or any collection letters. The 18 claims listed for various entities described as "opposing party in litigation" and listed in the amount of $1.00 could certainly have been scheduled more precisely. Moreover, "opposing party in litigation" is not a type of claim. It is unclear if these creditors are judgment creditors, prevailing parties in litigation entitled to fees, and/or law

firms who have been awarded costs and fees against Ms. Kelly. Regardless, if they are creditors required to be listed on Schedule E/F, then it is incumbent on Ms. Kelly to exercise reasonable diligence in scheduling them. She has a duty to file complete and accurate schedules, and listing the vast majority of claims in the amount of $1.00 demonstrates a dereliction of that duty. *See In re Napier-Lopez*, 23-10694-ABA, 2023 WL 3260150, at *2 (Bankr. D.N.J. May 4, 2023) ("Key to the bankruptcy process is the duty of a debtor to file complete and accurate schedules of assets and liabilities, current income and expenditures, executory contracts and unexpired leases, as well as a Statement of Financial Affairs."). Ms. Kelly can dispute every legal fee, judgment, bill, and loan, but that does not absolve her from accurately scheduling the amounts owed to those creditors.

Similarly, Mr. Myers' argument that all of the scheduled claims are time-barred because creditors have not proactively taken action to liquidate their claims does not reduce those claims to $1.00 or render them contingent and/or unliquidated for purposes of Section 109(e). Again, Ms. Kelly can dispute claims as being time barred, but any such dispute would be resolved by the claims resolution process and would involve an analysis of the extent to which any applicable statute of limitations may have been tolled due to Ms. Kelly's and Mr. Myers' numerous bankruptcy filings (among other considerations). At this stage of the bankruptcy case, however, Ms. Kelly cannot unilaterally determine that all claims are time-barred to fabricate her eligibility for relief under Chapter 13.

In the First Kelly Case, the Court concluded that Ms. Kelly failed to exercise reasonable due diligence in completing her schedules. Even though the Court's memorandum opinion in that case contained a thorough analysis of Ms. Kelly's ineligibility and many of the claims in this case were claims in the First Kelly Case, Ms. Kelly demonstrated an insolent lack of candor when she

55

filed her schedules in this case.  She has fallen far short of her duty to exercise reasonable diligence and good faith in completing her schedules, and her attempt to concoct Chapter 13 eligibility fails.

### 3.  <u>Analysis of Ms. Kelly's eligibility based on claims asserted</u>

Because of Ms. Kelly's failure to exercise reasonable diligence and good faith in completing her schedules, the Court finds it necessary to look beyond the schedules to determine Ms. Kelly's eligibility for Chapter 13.  Accordingly, the Court considers the entire record of this case (including the schedules), the proofs of claim filed in this case, the record of other related bankruptcy and non-bankruptcy cases, and the arguments and evidence presented at the hearing on the Motion to Dismiss.  In doing so, the Court finds it necessary to redesignate Ms. Kelly's characterization of numerous claims.

As stated above, for purposes of determining eligibility under Section 109(e), noncontingent debts are those where "all events necessary to give rise to liability take place prior to filing the petition."  *Parking Mgmt.*, 620 B.R. at 552 (quoting *In re Green,* 574 B.R. 570, 576–77 (Bankr. E.D.N.C. 2017)).  Liquidated debts are those debts where "the process for determining the claim is fixed, certain, or otherwise determined by a specific standard" and where the debt is "readily determinable."  *Parking Mgmt.*, 620 B.R. at 559 (quoting *In re Slack*, 187 F.3d 1070, 1073 (9th Cir. 1999)).

Examining the proofs of claim filed in the instant case, the Court concludes that ten of the 14 claims asserted in this case are for noncontingent and liquidated debts.  As discussed in more detail below, the Court excludes Claim Nos. 12-1 and 13-1 filed by NGBC and the NBC Entities, respectively, which were filed as "unliquidated" claims, and Claim Nos. 7-1 and 9-1 filed by Dunlap Bennett & Ludwig and Seaside Town Council, Inc., respectively, which lack sufficient supporting documentation for the Court to ascertain whether Ms. Kelly has liability on those

claims.  The Court will address the 14 claims in order of their filing.  The Court reiterates that Ms. Kelly characterized all 47 of the claims in her schedules as "unliquidated" and "disputed" and listed 36 of the claims as "contingent," including 13 of the 14 claims for which a proof of claim was filed.

Claim No. 1-1.  Florida Power & Light filed Claim No. 1-1, asserting a general unsecured claim in the amount of $878.73 for "unpaid electric bills."  The claim is accompanied by a bill through April 19, 2023, showing an outstanding balance of $790.93 and new charges through April 19, 2023 of $87.80.  Because Florida Power & Light filed the claim before Ms. Kelly filed her bankruptcy schedules in this case, this is one of the few claims listed in an accurate amount on her Schedule E/F, but she added that the claim amount is "estimated" and lists the claim as contingent, unliquidated, and disputed.  The bill attached to the claim establishes that the amount due is readily determinable and not contingent on a future event.  Thus, the claim is a noncontingent, liquidated claim.

Claim No. 2-2.  The United States Trustee filed Claim No. 2-2, which asserts a general unsecured claim in the amount of $250.00 for unpaid Chapter 11 fees under Chapter 123 of Title 28 of the United States Code.  The supporting documentation attached to the claim confirms that the fees are due and payable for the first quarter of 2023 in the Fourth Kelly Case.  These are statutorily imposed fees required to be paid quarterly in all Chapter 11 cases (other than cases filed under Subchapter V of the Bankruptcy Code) and are not dependent on the success or failure of the Chapter 11 case.  Rather, the fees are based on the greater of a percentage of disbursements made during a quarter, or $250.00 for each quarter, including "any fractions thereof," and begin accruing as soon as a case is filed.  28 U.S.C. § 1930(a)(6)(B).  As with the first filed claim, the United States Trustee filed the claim before Ms. Kelly filed her bankruptcy schedules so the claim

is listed in the correct amount on Ms. Kelly's Schedule E/F. However, again, Ms. Kelly listed the claim as contingent, unliquidated, and disputed. The claim is statutorily based and therefore readily determinable, and the claim is based on a past event (the Fourth Kelly Case) as opposed to a future event. The United States Trustee's claim is noncontingent and liquidated.

Claim Nos. 3-1 through 5-1. Utility companies filed Claim Nos. 3-1 through 5-1. Washington Suburban Sanitary Commission filed Claim No. 3-1, asserting a general unsecured claim for "services performed" in the amount of $10,617.96. Verizon filed Claim No. 4-1, asserting a general unsecured claim for "services rendered" for $1,132.79. Washington Gas filed Claim No. 5-1, asserting a general unsecured claim in the amount of $212.93 for "utility gas bill." All three of these creditors are listed on Ms. Kelly's Schedule E/F as having contingent, unliquidated, and disputed claims. Ms. Kelly scheduled Washington Suburban Sanitary Commission as having a claim in the amount of $1,000.00 even though it filed its claim before she filed her bankruptcy schedules. She also scheduled Verizon and Washington Gas as having claims in the amount of $1,000.00. All three claims are for prepetition utility services provided to Ms. Kelly and are supported by billing or account statements. These claims are not contingent on any future events and are liquidated; they are monthly or quarterly utility bills for services provided prepetition to Ms. Kelly.

Claim No. 6-1. Anastasia Law, P.L. filed Claim No. 6-1, which asserts a general unsecured claim in the amount of $45,738.51 for "legal services & guaranty." Ms. Kelly listed this creditor on Schedule E/F as having a contingent, unliquidated, and disputed claim in the amount of $1.00. The claimant attached to the claim form a "Personal Guaranty of Client's Spouse" signed by Ms. Kelly in which she unconditionally guaranteed the payment in full of all indebtedness incurred in connection with the firm's representation of Mr. Myers and specifically states that the indebtedness

owed to the firm "shall not be contingent upon any court order."  Because all events necessary to give rise to liability took place prior to filing the petition and the debt is readily determinable, the claim is noncontingent and liquidated.

Claim No. 7-1.  Dunlap Bennett & Ludwig PLLC filed Claim No. 7-1, asserting a general unsecured claim in the amount of $59,547.90 for "legal services."  Ms. Kelly's Schedule E/F lists the claimant as having a contingent, unliquidated, and disputed claim in the amount of $1.00 for "legal fees."  Because the claim does not attach any supporting documentation, the Court is unable to conclude whether the claim is noncontingent and liquidated.  Accordingly, the Court will not factor this claim into its determination of Ms. Kelly's Chapter 13 eligibility.

Claim No. 8-1.  U.S. Bank filed Claim No. 8-1, which asserts a claim secured by the Bethesda Property in the amount of $2,698,674.36 for "money loaned."  Ms. Kelly included U.S. Bank on her Schedule E/F as having a contingent, unliquidated, and disputed claim in the amount of $1.00 and states that the type of claim is "Opposing party in litigation."  U.S. Bank's claim includes prepetition arrearages in the amount of $1,283,051.28 and attaches a Mortgage Proof of Claim Attachment with a loan payment history as well as copies of the Note signed by Ms. Kelly, the Deed of Trust signed by Ms. Kelly and Mr. Myers, and other related loan documents.

Addendum D to Ms. Kelly's schedules states that there is no valid secured claim against the Bethesda Property because U.S. Bank commenced deficient foreclosure proceedings against the Bethesda Property and is now time-barred from bringing any claims due to a loan modification agreement allegedly entered into by Ms. Kelly and U.S. Bank in 2010.  Ms. Kelly expands on this argument in her opposition [Dkt. No. 55] to the Motion to Dismiss, in which she argues that U.S. Bank's asserted claim is contingent and unliquidated due to a "claim objection-lien avoidance

action" pending in the U.S. Bank Appeal in the Florida District Court.  Mr. Myers asserted this same argument at the dismissal hearing.

Addendum D's explanation of U.S. Bank's claim does not support Ms. Kelly's assertion that U.S. Bank does not have a valid, secured claim against the Bethesda Property.  To the contrary, Ms. Kelly avers that she entered into a loan modification agreement with U.S. Bank in 2010 and made payments pursuant to the loan modification agreement, but she challenges the manner in which U.S. Bank commenced foreclosure proceedings against the Bethesda Property and argues that U.S. Bank is now time-barred from pursuing foreclosure under Maryland's general three-year statute of limitations for civil actions.  *See* Md. Cts. & Jud. Proc. Code Ann. § 5-101 ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.").  Maryland law dictates otherwise.

As recently explained by the Maryland District Court:

> A fatal flaw in [the argument that a foreclosure action must be commenced within three years from an alleged default] is that Maryland does not apply a statute of limitations to foreclosures, which are actions in equity, not actions at law.  *See Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 360 (Md. 2007) ("Mortgage foreclosure is an equitable remedy in Maryland."); *Kirsner v. Hammond*, 261 A.2d 159, 160 (Md. 1970) (citing *Cunningham v. Davidoff*, 53 A.2d 777, 781 (Md. 1947)) (applying a rebuttable presumption of payment after twenty years, but no statute of limitations, in mortgage foreclosures).  Section 5-101 by its terms applies only to actions *at law*; it is therefore inapplicable.  Plaintiffs' statute of limitations argument thus fails.

*Brooks v. Cama Self Directed IRA, LLC*, CV JKB-18-2299, 2019 WL 418412, at *6 (D. Md. Jan. 31, 2019) (emphasis in original).  Moreover, any challenge to the manner in which U.S. Bank commenced foreclosure proceedings does not invalidate the underlying loan obligations or security

interest in the Bethesda Property; it is merely a defense that can be raised in connection with the procedural conduct of the foreclosure proceedings.[21]

Ms. Kelly and Mr. Myers further argue that the then-pending litigation in the Florida District Court renders U.S. Bank's claim contingent and unliquidated. They claim that ongoing litigation with U.S. Bank means that all events giving rise to its asserted secured claims did not occur as of the petition date and, therefore, that any asserted claim by U.S. Bank remains contingent and unliquidated until all appeals are exhausted and finally resolved.

As previously discussed, the referenced litigation is actually an appeal of two orders entered by the Florida Bankruptcy Court – one order that denied Mr. Myers' motion to reconsider an order overruling Mr. Myers' objection to U.S. Bank's claim [U.S. Bank Appeal, Dkt. No. 4-33] and a second order denying Mr. Myers' motion to reconsider an order terminating the automatic stay as to U.S. Bank's *in rem* interest, if any, in the Bethesda Property [U.S. Bank Appeal, Dkt. No. 4-34]. The Florida Bankruptcy Court did not determine in either order that U.S. Bank's

---

[21] NBC Entities' Exhibit 3 consists of various foreclosure-related orders and notices issued with respect to the Naples Property and the Bethesda Property. The Court admitted NBC Entities' Exhibit 3 at the July 10, 2023 hearing on the NBC Entities' Lift Stay Motion and the Motion to Dismiss. *See* II.E.1. above. Included in the combined exhibit are: (i) an order entered by the Maryland State Court on May 12, 2018, in the Foreclosure Litigation, in which the Maryland State Court denied Ms. Kelly and Mr. Myers' motion to stay, thereby allowing the foreclosure sale of the Bethesda Property to continue; (ii) an order entered by the Maryland State Court on August 15, 2018, in the Foreclosure Litigation, in which the Maryland State Court denied Ms. Kelly and Mr. Myers' motion to vacate the order denying the motion to stay and to dismiss the action; (iii) an order entered by the Court of Special Appeals of Maryland on November 12, 2020, in an appeal filed by Ms. Kelly and Mr. Myers with respect to the Foreclosure Litigation, in which the Court of Special Appeals explains that the appeal was stayed upon the filing of the Second Myers Case, confirms that the Second Myers Case had been dismissed, lifts the stay of the appeal, and directs the Clerk to issue a mandate with respect to the orders dismissing the appeal and denying Ms. Kelly and Mr. Myers' motion to reconsider; and (iv) a mandate issued by the Maryland Court of Special Appeals on November 20, 2020, confirming that, on October 5, 2019, Ms. Kelly and Mr. Myers' motion to dismiss the appeal was granted. The underlying filings in the aforementioned foreclosure proceeding were not admitted into evidence so the Court is unable to determine whether Ms. Kelly and/or Mr. Myers made the same arguments in the Foreclosure Litigation and related appeal as made herein regarding the applicable statute of limitations and the alleged deficient foreclosure complaint. Accordingly, the Court makes no findings as to whether any arguments made by Ms. Kelly and/or Mr. Myers would be precluded by *res judicata,* collateral estoppel, and/or any other preclusive doctrines with respect to those proceedings.

asserted claim or security interest in the Bethesda Property was invalid. Simply put, the postpetition outcome of the appeals in the Florida District Court, which were pending when Ms. Kelly filed this case, have no bearing on whether U.S. Bank's asserted claim factors into the eligibility analysis. As explained in *Ibbott* and *Parking Management*, the plain language of Section 109(e) requires consideration of debts as they exist as of the petition date, irrespective of postpetition events, including the outcome of any appeals. *In re Ibbott*, 637 B.R. at 575–76 (quoting *Parking Mgmt.*, 620 B.R. at 554). "To hold otherwise would mean that a debtor could float in and out of Chapter 13 eligibility during the course of a case, depending on what happens, which of course makes no legal or practical sense." *Parking Mgmt.*, 620 B.R. at 554.

All events necessary to give rise to Ms. Kelly's liability to U.S. Bank took place prior to filing the petition, and the amount of the debt is readily determinable. The fact that Ms. Kelly disputes U.S. Bank's claim is not relevant because Section 109(e) requires an analysis of only noncontingent and liquidated claims. The Court finds that U.S. Bank has a noncontingent, liquidated claim secured by the Bethesda Property in the amount of $2,698,674.36 for purposes of Section 109(e).

Claim No. 9-1. Seaside Town Council, Inc. filed Claim No. 9-1, asserting a general unsecured claim against Ms. Kelly in the amount of $22,931.66 based on a Consent Order Approving Settlement Agreement between Mr. Myers and the claimant that was entered on April 12, 2017 in an adversary proceeding related to the First Myers Case [Adv. Proc. 16-00472-MCR, Dkt. No. 25]. Ms. Kelly listed this creditor on her Schedule E/F as having a contingent, unliquidated, and disputed claim in the amount of $1.00 and says the type of claim is "Opposing party in litigation." Nothing in the consent order purports to impose liability on Ms. Kelly. Without further information, the Court is unable to conclude whether Ms. Kelly is liable on the

debt and whether the debt to the claimant is noncontingent and unliquidated.  Thus, the Court will not consider the claim in its eligibility analysis.

Claim No. 10-1.  Pillsbury Winthrop Shaw Pittman LLP filed Claim No. 10-1, which asserts a general unsecured claim against Ms. Kelly in the amount of $258,828.62 for "legal services and expenses."  The summary filed with the proof of claim states that Ms. Kelly was the "client" and that the fees and expenses were incurred between 2016-2017 for the matter titled "Seaside – Barbara Ann Kelly."  Ms. Kelly listed this creditor on her Schedule E/F as having a claim in the amount of $1.00.  This is one of the few claims that she did not list as "contingent" on Schedule E/F, although, like all of the other listed claims, it is characterized as unliquidated and disputed.  However, the proof of claim confirms the claim is in fact liquidated.  The summary filed with the claim states that the claim is based on six invoices dated between January 26, 2016 and April 30, 2017 totaling $258,828.62.  The process for determining this claim has been fixed and the amount of the claim is readily determinable based on the unpaid invoices.  This claim is noncontingent and liquidated for purposes of Section 109(e).

Claim No. 11-1.  Specialized Loan Servicing filed Claim No. 11-1, asserting a claim in the amount of $4,102,962.60 secured by the Naples Property.  As with the U.S. Bank claim, Ms. Kelly included Specialized Loan Servicing on her Schedule E/F as having a contingent, unliquidated, and disputed claim in the amount of $1.00 and states that the type of claim is "Opposing party in litigation."  The claim attaches a Mortgage Proof of Claim Attachment with a loan payment history as well as copies of a Fixed Rate Note dated June 30, 2005 with a maturity date of July 1, 2020, a Mortgage dated June 30, 2005, and other related loan documents.  Mr. Myers signed the Fixed Rate Note and the Mortgage for Ms. Kelly as her "Attorney in Fact."  Mr. Myers did not sign the documents, individually, as an obligor or grantor.

Addendum D to Ms. Kelly's schedules reiterates that Mr. Myers is not a party to the loan documents underlying Specialized Loan Servicing's claim and asserts that there is no legally valid secured claim against the Naples Property because Specialized Loan Servicing entered into a subsequent agreement to settle a legal dispute in which the parties to the agreement agreed to "extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract."  Addendum D also appears to argue that Specialized Loan Servicing cannot have a security interest in the Naples Property because the Naples Property is owned by Ms. Kelly and Mr. Myers but Mr. Myers is not a party to any of the underlying loan documents and/or contracts.  Ms. Kelly further asserts in her opposition to the Motion to Dismiss that Specialized Loan Servicing's asserted claim is contingent and unliquidated due to the pending "lien avoidance action" in the SLS Appeal in the Florida District Court filed by Mr. Myers against U.S. Bank, and Mr. Myers reiterated this position at the dismissal hearing.

The Court has examined Specialized Loan Servicing's claim and finds that it is sufficient to establish a noncontingent, liquidated claim for purposes of Section 109(e).  Although the claim and Ms. Kelly's explanation in Addendum D make clear that Mr. Myers is not obligated to Specialized Loan Servicing, the quoted "Contract" provision recited in Addendum D merely states that Specialized Loan Servicing may have agreed to settle a dispute presumably with Ms. Kelly "in exchange for those rights secured by the contract."  This provision in no way invalidates Specialized Loan Servicing's asserted secured claim.  As for whether Specialized Loan Servicing can have a claim secured by property owned as tenants by the entireties where only one spouse is obligated on the loan documents, if true, that would render the claim "disputed" and potentially unsecured but does not impact Ms. Kelly's eligibility for Chapter 13, which focuses on noncontingent, liquidated claims – not disputed claims – under the plain language of Section

109(e).  While these arguments may be made in defense to the ongoing foreclosure proceedings against the Naples Property, they do not render U.S. Bank's claim contingent or unliquidated.

Similarly, Ms. Kelly and Mr. Myers' assertion that any claim against the Naples Property is contingent because not all events giving rise to any such claim took place prepetition in light of the pending "lien avoidance action" in the SLS Appeal in the Florida District Court also fails.  Not only does it fail for the reasons discussed in connection with U.S. Bank's claim above (*i.e.*, claims are determined as of the petition date for purposes of Section 109(e) irrespective of pending appeals), but it also fails because the Court has reviewed the record in the SLS Appeal and the appeal does not involve Specialized Loan Servicing's asserted claim against the Naples Property. Rather, contrary to Ms. Kelly and Mr. Myers' characterization of the litigation, the appeal involves a dispute over funds being held in this Court's Registry as required by a consent order entered in the First Myers Case.

For these reasons, the Court finds that Specialized Loan Servicing has a noncontingent and liquidated claim against the Naples Property in the amount of $4,102,962.60 for purposes of Section 109(e).

Claim Nos. 12-1 and 13-1.  NGBC and the NBC Entities filed Claim Nos. 12-1 and 13-1, respectively.  Both assert an unliquidated claim based on the Florida State Court's Final Judgment. Each claimant attached a copy of the Final Judgment, which awarded costs in an undetermined amount to NGBC and the NBC Entities, and a copy of its motion for costs, which remains pending but stayed by this bankruptcy filing.  Because the Florida State Court has not determined the motion, these claims are unliquidated and are not considered by the Court in determining Ms. Kelly's eligibility for Chapter 13 relief under Section 109(e).

Claim No. 14-1.  The Maryland Comptroller of the Treasury filed Claim No. 14-1, asserting a general unsecured claim for unpaid 2014, 2015, and 2017 income taxes in the amount of $62,786.00 and a priority unsecured claim for related penalties and interest in the amount of $56,383.00 (a claim in the total amount of $119,169.00).  Attached to the claim is an itemization of the claim, breaking the claim into three components – taxes, penalties, and interest.  Ms. Kelly listed the Comptroller in her Schedule E/F with a claim of $1.00 and stated that the claim is contingent, unliquidated, and disputed.  The taxes, penalties, and interest are all dictated by the Internal Revenue Code.  Because the liability and amounts are statutorily imposed, not based on a future event, and are readily determinable, the claim is noncontingent and liquidated.

### 4.    Ms. Kelly's lack of Chapter 13 eligibility

Based on the foregoing analysis, the noncontingent, liquidated claims total $7,238,465.50, calculated as follows:

| | |
|---|---|
| Florida Power & Light [Claim No. 1-1] | $878.73 |
| United States Trustee [Claim No. 2-1] | $250.00 |
| Washington Suburban Sanitary Comm'n [Claim No. 3-1] | $10,617.96 |
| Verizon [Claim No. 4-1] | $1,132.79 |
| Washington Gas [Claim No. 5-1] | $212.93 |
| Anastasia Law, P.L. [Claim No. 6-1] | $45,738.51 |
| U.S. Bank [Claim No. 8-1] | $2,698,674.36 |
| Pillsbury Winthrop Shaw Pittman LLP [Claim No. 10-1] | $258,828.62 |
| Specialized Loan Servicing [Claim No. 11-1] | $4,102,962.60 |
| Maryland Comptroller of the Treasury [Claim No. 14-1] | $119,169.00 |
| TOTAL | $7,238,465.50 |

In reviewing the claims asserted, the Court was guided by two overriding principles.  The first is that the eligibility analysis is not impacted by a debtor's dispute of any of the claims.  The statute expressly provides that only debts that are both noncontingent and liquidated are considered.  Although a debtor may dispute a claim, the dispute does not render the claim contingent or unliquidated.  *See generally Ibbott*, 637 B.R. at 574-79 (discussing standard for

Chapter 13 eligibility); *Parking Mgmt.*, 620 B.R. at 550-54 (same). The second principle driving the Court's analysis is that, when the Court has reason to question the veracity or accuracy of a debtor's schedules, the Court must look beyond the schedules to all of the evidence available to determine whether the debtor's noncontingent, liquidated debts exceeds the statutory amount. *See Barcal v. Laughlin (In re Barcal)*, 213 B.R. 1008, 1015 (8th Cir. B.A.P. 1997) ("At a hearing on eligibility, the court should thus, canvass and review the debtor's schedules and proofs of claim, as well as other evidence offered by a debtor or the creditor to decide only whether the good faith, facial amount of the debtor's liquidated and non-contingent debts exceed statutory limits."); *In re Stern*, 266 B.R. 322, 326 (Bankr. D. Md. 2001) (a bankruptcy court can "scrutinize and redesignate the characterization by a debtor of any given debt when that characterization is the subject of a case or controversy"); *In re Kelly*, No. 18-13244-WIL, 2018 WL 4354653, at \*5 (Bankr. D. Md. Sept. 11, 2018) ("it would eviscerate the Chapter 13 eligibility requirements if a court could only consider a debtor's schedules regardless of their completion and apparent inaccuracies").

Ms. Kelly's noncontingent, liquidated debts total $7,238,465.50 and exceed the debt limit imposed by Section 109(e).[22] Therefore, she is not eligible to be a Chapter 13 debtor and this case must be dismissed.

### C. Dismissal With Prospective Relief for Bad Faith Conduct Under Sections 105(a), 349(a), and 1307(c)

#### 1. Dismissal under Section 1307(b) or Section 1307(c)

Although Ms. Kelly's ineligibility for Chapter 13 under Section 109(e) mandates the dismissal or conversion of this case, that does not end the Court's analysis. In fact, now that Ms.

---

[22] The Court makes no determination as to the validity of the remaining claims for which proofs of claim were filed (*i.e.*, the claims filed by Dunlap Bennett & Ludwig PLLC, Seaside Town Council, Inc., NGBC, and the NBC Entities). The Court is merely finding that they lack sufficient supporting information to overcome Ms. Kelly's characterization as unliquidated and/or contingent for purposes of Section 109(e).

67

Kelly has moved to dismiss her case, the question of whether she filed this case in good faith is of paramount importance for the Court.

The ultimate issue for the Court is whether it should dismiss this case under Section 1307(b) based on Ms. Kelly's request for voluntary dismissal with a 180-day bar to refiling under Section 109(g), as requested by Mr. Myers, or whether it should dismiss the case under Section 1307(c) subject to a longer bar to refiling based on Ms. Kelly's bad faith conduct imposed under Section 105(a), as requested in the NBC Entities' Motion to Dismiss (joined by four parties in interest). Section 1307(b) permits a debtor to dismiss her case at any time if the case was not previously converted. 11 U.S.C. § 1307(b) ("On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter.") Section 1307(c) provides that "on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause" and then sets forth a nonexhaustive list of factors that may constitute cause. 11 U.S.C. § 1307(c).

While bad faith is not included in the enumerated factors set forth in Section 1307(c), courts have applied a "good faith" standard to Chapter 13 cases when deciding whether to dismiss a case "for cause" under Section 1307(c). *In re Moroney*, 330 B.R. 527, 531 (Bankr. E.D. Va. 2005). Courts use a "totality of the circumstances" test in determining whether a Chapter 13 case was filed in good faith, and the burden of proving that the case should be dismissed is on the moving party. *Id.* In *Marrama*, the Supreme Court determined that "cause" under Section 1307(c) implicitly includes prepetition bad faith conduct and reasoned that a finding of prepetition bad

68

faith conduct "is tantamount to a ruling that the individual does not qualify as a debtor under

Chapter 13." *Marrama*, 549 U.S. at 374.

### 2.    Good faith standard in Chapter 13 cases

Although the Bankruptcy Code does not define "bad faith" or "good faith," this Court

previously provided a thorough analysis of the relevant case law discussing "bad faith":

> It is well settled that in the absence of a legislative definition of a
> particular term, that the term will be ascribed the common meaning
> that has arisen through judicial interpretation over time.  In *CoStar
> Group, Inc. v. Loopnet, Inc.,* 373 F.3d 544 (4th Cir. 2004), the Court
> of Appeals for the Fourth Circuit quoted the United States Supreme
> Court when writing, "[t]he normal rule of statutory construction is
> that if Congress intends for legislation to change the interpretation
> of a judicially created concept, it makes that intent specific." *Id.* at
> 553 (quoting *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.,* 474
> U.S. 494, 501, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986)).  *See also The
> Penn Mutual Life Ins. Co. v. Woodscape L.P. (In re Woodscape
> L.P.),* 134 B.R. 165 (Bankr. D. Md. 1991).  Accordingly, the court
> will look to judicially created definitions of good faith that are
> helpful to the necessary analysis under Section 362(c)(3).
>
> In the case of *Carolin Corp. v. Miller,* 886 F.2d 693 (4th Cir. 1989),
> the United States Court of Appeals for the Fourth Circuit explored
> the requirement of good faith in the context of a motion to dismiss
> chapter 11 case brought under Section 1112(b) of the Bankruptcy
> Code.  The Court began its analysis by adopting a good faith filing
> requirement, that although not expressed in the Bankruptcy Code,
> was mandated in order to "protect[ ] the jurisdictional integrity of
> the bankruptcy courts by rendering their powerful equitable
> weapons (i.e., avoidance of liens, discharge of debts, marshalling
> and turnover of assets) available only to those debtors and creditors
> with 'clean hands.'" *Id.* at 698.  The Court determined that a creditor
> seeking to dismiss the Chapter 11 case alleging that it was filed in
> bad faith, was required to prove two elements.  Those elements:
> objective futility and subjective bad faith, were to be decided by an
> analysis of the totality of the circumstances.  *Id.* at 701–02.
>
> As to the objective futility component, the Court reasoned that the
> proper analysis required a determination whether there was any
> "hope of rehabilitation, except according to the debtor's 'terminal
> euphoria' [.]" *Id.* at 701–02 (quoting *In re Little Creek Development
> Co.,* 779 F.2d 1068, 1073 (5th Cir. 1986)).

The subjective inquiry into bad faith, however, was stated to be "designed to ensure that the petitioner actually intends 'to use the provisions of Chapter 11 ... to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of a viable or existing business.'" *Id.* at 702 (quoting *In re Victory Constr. Co.,* 9 B.R. 549, 564 (Bankr. C.D. Cal. 1981) (*Victory I*)).  The Court further stated that the "aim is to determine whether the petitioner's real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities.'" *Id.* (quoting *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. B.A.P. 1983)).

Prior to its decision in *Carolin Corp.,* the Court of Appeals, in *Neufeld v. Freeman,* 794 F.2d 149 (4th Cir. 1986), described the meaning of good faith when applied to confirmation of a chapter 13 plan.  The Court held that to confirm a chapter 13 plan, the plan had to be proposed in good faith as provided by Section 1325(a) of the Bankruptcy Code.

In the *Neufeld* decision, the Court re-enumerated factors first announced in the earlier decision of *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir. 1982), and then added one more.  These factors included, among other things, employment history, unsecured claims, past bankruptcy filings, honesty in the schedules, any exceptional circumstances facing the debtor, what changes had occurred, the economic basis for the current case, the motivation of the debtor in the current case and the prepetition conduct of the debtor.  *Id.* at 152–53.

That latter factor was added in the context of an argument as to whether or not a non-dischargeable debt in a Chapter 7 resulting from some egregious conduct of the debtor should weigh as to the ability of the debtor to obtain a Chapter 13 discharge, which would have included such debt.  *Id.*  The ultimate purpose of this inquiry, according to the Court of Appeals, was "to determine whether or not, considering 'all militating factors,' there has been 'an abuse of the provisions, purpose, or spirit' of Chapter 13 in the proposal or plan."  *Id.* at 152 (quoting *Deans v. O'Donnell,* 692 F.2d at 972).

*       *       *

To determine whether or not there has been an abuse of the provisions, purpose or spirit of Chapter 13, the court will look to the factors announced in *Neufeld*, as well as the objective futility standard and subjective intent standards pronounced in the dismissal context in the chapter 11 *Carolin Corp.* decision.

*In re Mark*, 336 B.R. 260, 265-267 (Bankr. D. Md. 2006) (reviewing "bad faith" in context of motion to extend stay).

### 3.    Authority of Court to dismiss with a bar to refiling

Two provisions of the Bankruptcy Code expressly allow a bankruptcy court to dismiss a case with a bar to refiling.  The first is Section 349(a), which provides:

> Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title.

11 U.S.C. § 349(a).  Although the dismissal of a bankruptcy case typically does not bar the debtor from filing a subsequent bankruptcy case, the plain language of Section 349(a) provides that a court may order otherwise "for cause."  *Id.*

The other provision of the Bankruptcy Code that permits a court to dismiss a case with a bar to refiling is Section 105(a).  This section affords a bankruptcy court broad power to dismiss a case or take other action necessary to prevent an abuse of the bankruptcy system.  Section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.  No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).  "[T]he Fourth Circuit has held that the Bankruptcy Code's omnibus provision for judicial administration, 11 U.S.C. § 105, vests bankruptcy courts with 'authority to issue any order necessary or appropriate to carry out the provisions of the bankruptcy code,' including dismissals 'for lack of good faith.'"  *Williams v. Gorman*, 1:20-CV-1206RDA/IDD, 2021 WL

4267277, at *5 (E.D. Va. Sept. 20, 2021), *appeal dismissed,* 21-2204, 2021 WL 8156027 (4th Cir. Dec. 28, 2021) (quoting *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 149 (4th Cir. 1996) and *In re Walters*, 868 F.2d 665, 669 (4th Cir. 1989)).

"Where there is sufficient cause, bankruptcy courts have the authority pursuant to 11 U.S.C. §§ 105(a) and 349(a) to prohibit bankruptcy filings in excess of 180 days." *Cusano v. Klein (In re Cusano)*, 431 B.R. 726, 737 (6th Cir. B.A.P. 2010); *see also Colonial Auto Ctr. v. Tomlin (In re Tomlin),* 105 F.3d 933, 938–39 (4th Cir. 1997) (holding that the language of Section 349 makes "clear that the court has the power to order such a sanction in circumstances other than those dealt with by [Section 109(g)]") and *Palsata Tr. v. Fitzgerald*, 121CV376RDAIDD, 2022 WL 981939, at *5 (E.D. Va. Mar. 30, 2022) ("The bankruptcy code in 11 U.S.C. § 349(a) confers discretion on bankruptcy courts to restrict a debtor's ability to file future cases.").  This authority extends to cases dismissed under Section 1307(b) and/or Section 1307(c).  *See In re Ross*, 858 F.3d 779, 781 (3d Cir. 2017) ("[We] hold that a bankruptcy court does indeed have the authority to issue a filing injunction even in the context of approving a debtor's § 1307(b) voluntary dismissal because nothing in the Bankruptcy Code's express terms says otherwise.").   As succinctly stated by the United States Bankruptcy Appellate Panel of the Ninth Circuit: "[a]ll roads to dismissal pass through Bankruptcy Code § 349(a)."  *Duran v. Gudino (In re Duran)*, 630 B.R. 797, 804 (9th Cir. B.A.P. 2021) ("[E]very dismissal, including a § 1307(b) motion to dismiss, triggers the § 349(a) issue whether 'cause' exists to order that dismissal be with prejudice[.]").  The *Duran* court added that "[f]rom the standpoint of the debtor, the moral of the story is that the § 1307(b) 'right' to dismiss is not a get-out-of-chapter-13-free card." *Id.*  Accordingly, even when a case is dismissed voluntarily by a debtor, the bankruptcy court may impose restrictions or limitations on the dismissal under Sections 105(a) and/or 349(a).

72

4.     **Evidence of Ms. Kelly's bad faith**

Applying the principles set forth above to the instant case, the Court finds that there is overwhelming evidence of bad faith conduct by Ms. Kelly to warrant dismissal of this case with a bar to refiling sufficient to curtail the effects of Ms. Kelly's (and, by extension, Mr. Myers') exploitation of the bankruptcy process. This evidence is found in Ms. Kelly's prepetition conduct in connection with other litigation and bankruptcy cases, her history of unsuccessful and insincere bankruptcy filings, her complete disregard of her duty to present an accurate picture of her financial condition through her bankruptcy schedules, her continued attempts to relitigate issues decided by this Court in other bankruptcy cases despite prior warnings that such conduct is sanctionable, and her burdensome and frivolous litigation over the eight years that this Court has been acquainted with her and Mr. Myers.

a.     **Findings of bad faith by the Maryland District Court**

This Court is not the first court to conclude that Ms. Kelly has acted in bad faith. Perhaps the most compelling evidence of Ms. Kelly's prepetition bad faith is that the Maryland District Court – in at least five different written decisions – has determined that Ms. Kelly acted in bad faith in litigation before that court.

*Myers, et al. v. Schlossberg*, Case No. 8:18-cv-03783-PX. This case was an appeal by Ms. Kelly and Mr. Myers of an Order Dismissing Emergency Motion for Accounting and Order Releasing Exempt Property [First Myers Case, Dkt. No. 784] entered by this Court in the First Myers Case. In its Memorandum Opinion and Order [Case No. 8:18-cv-03783-PX, Dkt. No. 10] dismissing the appeal entered on February 1, 2019, the Maryland District Court stated that Ms. Kelly and Mr. Myers "have persisted in questionable litigation strategy that can only be viewed as dilatory and irresponsible" and relied on the fact that Ms. Kelly and Mr. Myers designated all 800

docket entries from the First Myers Case as part of the record on appeal despite the appeal presenting a narrow question of law and their failure to file an opening brief or justify the need for additional time to do so.  Memorandum Opinion and Order, at p. 2.  The Maryland District Court further stated that Mr. Myers has filed no fewer than ten separate appeals related to his bankruptcy case, "none of which have yet proven meritorious," and the Maryland District Court found persuasive the argument of the Myers Chapter 7 Trustee appointed in the First Myers Case that the delay caused by Ms. Kelly and Mr. Myers frustrated his ability to timely administer assets and resolve Mr. Myers' bankruptcy estate.  Memorandum Opinion and Order, at p. 4.  The Maryland District Court concluded that "[a]lthough dismissal is a harsh sanction, and not to be imposed lightly, nothing less is warranted where Appellants have engaged in questionable tactics evidently designed to delay the resolution of the bankruptcy case."  Memorandum Opinion and Order, at p. 5.

_Myers v. McNamee, Hosea, Jernigan, Kim, Greenan, & Lynch, P.A., et al._, Case No. 8:18-cv-03460-PX.  In this appeal by Mr. Myers of a fee award entered in the First Myers Case, the Maryland District Court entered a Memorandum Opinion and Order [Case No. 8:18-cv-03460-PX, Dkt. No. 27] on February 14, 2020, dismissing the appeal.  In the opinion, the Maryland District Court addressed an argument by Mr. Myers' that the appeal should be stayed by the filing of the Third Kelly Case.  The Maryland District Court noted that, instead of filing a substantive response to a pending motion to dismiss by the deadline of November 12, 2019, Mr. Myers instead filed a suggestion of bankruptcy on November 12, 2019, for the Third Kelly Case.  In explaining why the filing of the Third Kelly Case did not stay it from considering the merits of the appeal, the Maryland District Court stated, "In this Court's view, Myers once again attempts, seemingly in bad faith, to manufacture further delay in the resolution of his claims.  The Court cannot

countenance Myers' now routine abuses of process to defer ultimate resolution on the merits." Memorandum Opinion and Order, at p. 9. Although the Maryland District Court's language is directed at Mr. Myers' dilatory actions, it is clear from the Maryland District Court's findings that the filing of the Third Kelly Case was at least in part to delay the adjudication of Mr. Myers' appeal. Notably, in a footnote, the Maryland District Court also addressed Ms. Kelly's various appeals of bankruptcy court decisions by stating, "Kelly is also a party to the November 2015 Bankruptcy Petition, and, often in concert with Myers, frequently notices her own scattershot bankruptcy appeals." Memorandum Opinion and Order, at p. 7 (citing *Kelly v. United States Trustee*, 8:17-cv-01239-PX; *Kelly v. Schlossberg*, 8:17-cv-03846-PX; *Myers v. Schlossberg*, 8:18-cv-00336-PX; *Kelly v. Grigsby*, 8:18-cv-02345-PX; *Myers v. Offit, Kurman, P.A.*, 8:18-cv-02536-PX; and *Myers v. Schlossberg*, 8:18-cv-03783-PX).

*Kelly v. Offit Kurman, P.A.*, Case No. 1:17-cv-03668-CCB. In this litigation, Ms. Kelly asserted breach of contract, fraud, malpractice, breach of fiduciary duty, and intentional infliction of emotional distress claims against her prior counsel, Offit Kurman, P.A. ("Offit Kurman"). Pending before the Maryland District Court were various motions, including a motion to strike a suggestion of bankruptcy filed by Ms. Kelly to reflect the filing of the Fourth Myers Case. In a 37-page Memorandum Opinion [Case No. 1:17-cv-03668-CCB, Dkt. No. 58], issued August 23, 2021, addressing the pending motions, including the motion to strike the suggestion of bankruptcy filing, the Maryland District Court stated that "the motions in this case are interrelated and are the result of Kelly's tactics to delay deadlines and/or delay the court's ruling on the motion to dismiss[.]" Memorandum Opinion, at p. 10. The opinion addresses the Maryland District Court's rejection of prior attempts to stay ongoing appeals based on a newly filed bankruptcy case by Ms.

Kelly, the same tactic she was attempting to use to stay the Offit Kurman litigation.  Memorandum

Opinion, at pp. 13-14.  The Maryland District Court concluded:

> The amended complaint's injection of unrelated and/or previously
> known issues into the case is evidence that the amended
> complaint was filed in bad faith and for the purpose of the delay and, like the
> motion to disqualify, the amended complaint was filed in lieu of a
> response to the motion to dismiss following one of the numerous
> extended deadlines the court offered to Kelly to submit such
> response.

Memorandum Opinion, at p. 26.

_Kelly, et al. v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch P.A., et al._, Case No.

8:21-cv-01186-GJH (lead case, with member cases 21-cv-01184-GJH and 21-cv-01185-GJH).

This case involved three separate appeals filed by Ms. Kelly and Mr. Myers related to the First

Myers Case, including an appeal of a Memorandum to Parties in Interest Regarding Entireties and

Exemption Issues Previously Litigated [First Myers Case, Dkt. No. 944] (the "Lot 6

Memorandum").  The Maryland District Court consolidated and dismissed the appeals in a

Memorandum Opinion and Order [Case No. 8:21-cv-01186-GJH, Dkt. No. 5] entered on

March 23, 2022.  In its decision, the Maryland District Court determined that Ms. Kelly and Mr.

Myers were acting in bad faith and stated:

> As Judge Paula Xinis of this Court has noted in several of her
> previous opinions involving both Appellants, to which Appellee
> McNamee draws the Court's attention, "Appellants [Gregory Myers
> and Barbara Ann Kelly] have persisted in questionable litigation
> strategy that can only be viewed as dilatory and irresponsible,"
> _Myers v. Schlossberg_, No. 18-cv3783-PX, 2019 WL 414875, at *1
> (D. Md. Feb. 1, 2019), and, as of February 2020, "[Appellant Myers]
> ha[d] filed 15 bankruptcy appeals and five civil cases related to his
> 2015 bankruptcy action, the overwhelming majority of which have
> been dismissed either by the Court or by Myers voluntarily after he
> failed to designate the record, file a brief, or pay his filing fees."
> _Myers v. United States Tr._, No. 19-cv-00637-PX, 2020 WL 758157,
> at *1 (D. Md. Feb. 13, 2020).  It is apparent that this Court has
> previously warned Appellants that their questionable litigation
> tactics are both "dilatory and irresponsible," _Myers_, 2019 WL

414875, at *1, and this, coupled with the fact that Appellants have not, in any way, attempted to meet procedural deadlines in this case, including designating the record under Rule 8009, which requires the appellant to file and serve the designation and statement within fourteen days of the appellant's notice of appeal, or filing an appeal brief under Rule 8018(a)(1), which requires the appellant to file a brief within thirty days after the notice of transmittal of the record on appeal has been docketed, leads the Court to believe that that these three appeals are, likewise, efforts to further delay Appellants' underlying bankruptcy proceeding. *See In re Weiss*, 111 F.3d at 1173 (holding that "bad faith was inferable from the overall behavior of the [the appellant] throughout the procedure.").

Memorandum Opinion and Order, at pp. 5-6.

_Kelly v. United States Trustee_, 8:23-cv-00958-DLB. This case was an appeal by Ms. Kelly of this Court's order dismissing the Fourth Kelly Case. On June 21, 2023, the Maryland District Court entered an order dismissing the appeal [Case No. 8:23-cv-00958-DLB, Dkt. No. 9] because Ms. Kelly failed to comply with Bankruptcy Rule 8009 and failed to show cause for the delayed filing. The Maryland District Court emphatically rejected Ms. Kelly's argument that she failed to file a designation of the record on appeal and statement of issues because she believed the appeal was stayed by the filing of the instant bankruptcy case. Order, at pp. 2-3. The Maryland District Court stated that Ms. Kelly failed to identify a legal basis "to support her assumption that the stay would affect court proceedings that the debtor herself initiated, as opposed to proceedings filed by a party seeking the debtor's assets." Order, at p. 3. The Maryland District Court further stated:

Kelly in particular cannot assert this belief sincerely. In one of Kelly's several previous bankruptcy appeals—an appeal that was pending simultaneously with another appeal that Kelly and her husband Gregory Myers jointly filed and a third appeal that Myers filed separately—Kelly informed the court that she had filed a Chapter 13 voluntary bankruptcy petition and "asserted that the new bankruptcy petition operated to stay automatically the appeals pursuant to 11 U.S.C. § 362(a) (the automatic stay provision)." ECF 25, at 3–4 in *Kelly v. Schlossberg*, No. PX-17-3846 (D. Md. June 27, 2018). When this court dismissed all three appeals on mootness grounds, the court observed that applying the § 362(a) stay in th[e] context [of the debtors' appeals] would work a peculiar outcome:

> Kelly seeks the protection of a stay to stall appeals that she took—either jointly with or in parallel to Myers. It would "be odd to apply one of the fundamental debtor protections provided by the bankruptcy laws to prevent the debtor[s] ... from litigating a motion they themselves have filed and briefed." *Id.* at 8–9 (quoting *MTGLQ Investors, L.P. v. Guire*, 286 F. Supp. 2d 561, 563 (D. Md. 2003) (internal quotation marks and citation omitted)). Despite having been advised in 2018 by another judge in this court that the protections of a stay under § 362(a) do not apply to a debtor's appeal, Kelly has the audacity to argue to this Court that she thought the stay did apply to her appeal. *See id.* The Court has no trouble concluding that Kelly's argument that she believed the stay applied to this appeal was not made in good faith.

Order, at p. 3.

The Maryland District Court also determined that Ms. Kelly's belated designation of the entire bankruptcy record as opposed to only the relevant docket entries was not made in good faith. Order, at pp. 3-4. The Maryland District Court stated that Ms. Kelly could "not claim ignorance of this requirement" in light of Judge Xinis' warning in *Myers v. Schlossberg*, Case No. 8:18-cv-03783-PX, that she and Mr. Myers risked dismissal of the appeal because they designated all 800 docket entries in the appeal of a narrow issue. Order, at pp. 3-4. The Maryland District Court went on to state that Ms. Kelly "is no stranger to the procedures for bankruptcy appeals, so she cannot feign ignorance of Rule 8018's requirement [to serve and file a brief within 30 days]." Order, at p. 4.

Lastly, in addressing Ms. Kelly's explanation that her response to an order to show cause was five days late because she had been traveling domestically and had a flood in her home, the Maryland District Court stated that such reasons are "not valid excuses for missing the deadline to respond to the order to show cause." Order, at p. 5. The court stated that Ms. Kelly "has filed numerous bankruptcy petitions and appeals and should be aware that she should check her mail or the docket regularly." Order, at p. 5. Ultimately, the court concluded:

> Having considered the specific conduct of Kelly in this case and the knowledge imputed to her by virtue of her other bankruptcy appeals in the District of Maryland, the Court finds that Kelly acted in bad faith by failing to timely file her designation of the record and statement of issues. Dismissal of her appeal is warranted. Kelly's appeal is dismissed.

Order, at p. 5.

The above five Maryland District Court cases make clear that, despite being well-acquainted with the bankruptcy and appellate processes, Ms. Kelly continually disregards filing requirements, makes arguments that have been categorically rejected in prior cases, and prosecutes cases in bad faith.[23]

### b. Timing of Ms. Kelly's and Mr. Myers' bankruptcy filings relative to foreclosure proceedings

NBC Entities' Exhibit 2, which includes a timeline comparing the nine bankruptcy filings by Ms. Kelly and Mr. Myers with scheduled foreclosure sales, highlights Ms. Kelly's (and Mr.

---

[23] The Maryland District Court has also issued scathing written decisions regarding Mr. Myers' bad faith conduct. For example, the Maryland District Court said:

> [Failing to prosecute appeals] has become a longstanding pattern for Myers. In his twenty cases, Myers initiates the action, then exhibits a dereliction in prosecution that reflects no real interest in resolution on the merits. The Court cannot help but conclude that Myers' true goal is to gum up the judicial process for his own personal benefit and ignore valid court orders as he sees fit. … At this juncture, Myers is on notice that further similar conduct may result in the initiation of contempt proceedings against him.

*Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 8:19-cv-00636-PX, 2020 WL 758154 at *4 (D. Md. Feb. 13, 2020). The Maryland District Court also said:

> Myers has undoubtedly used (and abused) the judicial process to prolong proceedings in the bankruptcy matter and thus delay liquidation and distribution of Myers' assets. Specifically, Myers has filed no fewer than *fifteen appeals* and several other collateral actions related to [a] 2015 singular bankruptcy, the lion's share of which have been dismissed or denied on procedural grounds. Indeed, when viewed collectively, Myers' overall objective appears largely to defer rather than reach meaningful resolution on the merits. … This case presents its own microcosm of Myers' dilatory tactics. … In this Court's view, Myers once again attempts, seemingly in bad faith, to manufacture further delay in the resolution of his claims. The Court cannot countenance Myers' now routine abuses of process to defer ultimate resolution on the merits.

*Myers v. McNamee, Hosea, Jernigan, Kim, Greenan & Lynch, P.A.*, No. 8:18-cv-03460-PX, 2020 WL 758151 at *3-5 (D. Md. Feb. 14, 2020) (emphasis in original).

Myers') bad faith conduct and abuse of the bankruptcy process. The timeline is supported by copies of various bankruptcy petitions and dismissal orders in NBC Entities' Exhibit 2 and copies of various foreclosure notices and orders included in NBC Entities' Exhibit 3. The timeline underscores Ms. Kelly and Mr. Myers' exploitation of the bankruptcy process:

➢ On November 18, 2015, Mr. Myers filed the First Myers Case.
➢ On November 19, 2015, a foreclosure sale of the Naples Property was scheduled to occur.

➢ On March 12, 2018, the Maryland State Court denied Ms. Kelly's request to stay the foreclosure of the Bethesda Property in the Foreclosure Litigation.
➢ On March 13, 2018, Ms. Kelly filed the First Kelly Case.

➢ On August 15, 2018, the Maryland State Court entered an order permitting the foreclosure sale of the Bethesda Property to proceed in the Foreclosure Litigation.
➢ On August 24, 2018, Ms. Kelly filed the Second Kelly Case in the Florida Bankruptcy Court.

➢ On February 27, 2019, Mr. Myers filed the Second Myers Case in the Delaware Bankruptcy Court.
➢ On February 28, 2019, a foreclosure sale of the Naples Property was scheduled to occur.

➢ On May 31, 2019, Mr. Myers filed the Third Myers Case in this Court.
➢ On June 3, 2019, a foreclosure sale of the Naples Property was scheduled to occur.

➢ On October 30, 2019, Ms. Kelly filed the Third Kelly Case in this Court.
➢ On October 31, 2019, a foreclosure sale of the Naples Property was scheduled to occur.

➢ On November 12, 2020, the Maryland Court of Special Appeals entered an order and related mandate providing that the stay of the appeal of the foreclosure of the Bethesda Property was lifted due to dismissal of the Third Myers Case.
➢ On January 28, 2021, Mr. Myers filed the Fourth Myers Case in the Florida Bankruptcy Court.

➢ On March 8, 2023, Ms. Kelly filed the Fourth Kelly Case in this Court.
➢ On March 9, 2023, a foreclosure sale of the Naples Property was scheduled to occur.

➢ On April 19, 2023, Ms. Kelly filed this bankruptcy case.
➢ On April 20, 2023, a foreclosure sale of the Naples Property was scheduled to occur.

This timeline highlights that every one of the nine bankruptcy cases filed by Ms. Kelly and Mr. Myers were filed on the eve of a foreclosure sale or soon after a state court entered an order permitting a foreclosure proceeding to continue.  Without question, Ms. Kelly and Mr. Myers have manipulated the bankruptcy system to thwart attempts by Specialized Loan Servicing and U.S. Bank to execute on their security interests since 2015.

**c.    Ms. Kelly's bad faith in her prior
<u>unsuccessful bankruptcy filings</u>**

This is Ms. Kelly's fifth unsuccessful bankruptcy filing since 2018.  She has also had the benefit of the automatic stay of Section 362(a) arising from Mr. Myers' four bankruptcy cases.  As recognized above, it is clear that Ms. Kelly and Mr. Myers strategically use the bankruptcy system not only to ward off foreclosure proceedings but also to delay the multitude of ongoing appeals and litigation to which they are parties.  One spouse files for bankruptcy to obtain the benefit of the automatic stay and the other spouse attempts to use the bankruptcy filing as a dilatory tactic in other litigation.  When that fails, the other spouse then files a new bankruptcy case for the same dilatory purposes.  It is a perpetual cycle of meritless litigation that holds creditors hostage to the judicial system.  The unsuccessful nature of Ms. Kelly's bankruptcy cases demonstrates a lack of a genuine desire to reorganize her affairs and an intent to abuse the bankruptcy system.

In the First Kelly Case, on July 13, 2018, the Court granted a motion to dismiss filed by the Chapter 13 trustee appointed in that case based on a lack of Chapter 13 eligibility under Section 109(e) [First Kelly Case, Dkt. No. 74].  Ms. Kelly and Mr. Myers filed separate, nearly identical motions to reconsider the dismissal of the case [First Kelly Case, Dkt. Nos. 78 and 79] and separate notices of appeal of the order dismissing the case [First Kelly Case, Dkt. Nos. 80 and 81].  On September 11, 2018, the Court entered a memorandum opinion and related order denying the motions to reconsider [First Kelly Case, Dkt. Nos. 95 and 96].  The memorandum opinion detailed

the deficiencies and omissions with Ms. Kelly's bankruptcy schedules, determined that Ms. Kelly did not exercise proper due diligence in completing her schedules, analyzed the filed claims in the case, and concluded that Ms. Kelly was not eligible to be a Chapter 13 debtor under Section 109(e).

On August 24, 2018 – after the parties fully briefed the eligibility issue, the Court held a hearing, and the Court dismissed the case but shortly before the Court issued the memorandum opinion – Ms. Kelly commenced the Second Kelly Case in the Florida Bankruptcy Court by filing another Chapter 13 petition. The Florida Bankruptcy Court quickly dismissed the Second Kelly Case.

Notwithstanding the thorough discussion and findings of the Court in its eligibility memorandum opinion in the First Kelly Case and the fact that Ms. Kelly's financial condition was substantially similar to what it was during the First Kelly Case, Ms. Kelly filed yet another Chapter 13 petition to commence the Third Kelly Case on October 30, 2019. When the Court issued an order to show cause why the case should not be dismissed due to a lack of Chapter 13 eligibility [Third Kelly Case, Dkt. No. 80], Ms. Kelly filed a motion to voluntarily dismiss the case [Third Kelly Case, Dkt. No. 82], which the Court granted with a bar to refiling another bankruptcy petition for 180 days under Section 109(g) [Third Kelly Case, Dkt. No. 83].

Appearing to have finally conceded that she is not eligible for Chapter 13 relief, Ms. Kelly commenced the Fourth Kelly Case by filing a Chapter 11 petition. In that case, Ms. Kelly filed a master mailing matrix with her petition, listing 23 creditors. Two days later, the Court dismissed the Fourth Kelly Case for failure to file the list of her 20 largest unsecured creditors, as required by Local Bankruptcy Rule 1002-1(a). Instead of filing a motion to reconsider along with the required list of creditors, Ms. Kelly filed a motion to reconsider in which she argued erroneously and without support that an individual Chapter 11 debtor is not required to file a list of her 20

largest unsecured creditors.  After entry of an order denying the motion to reconsider, which explained that Bankruptcy Rule 1007(d) requires every Chapter 11 debtor to file a list of her 20 largest unsecured creditors, Ms. Kelly filed a second motion to reconsider along with an appeal of the order dismissing the Fourth Kelly Case.  In response, the Court issued a "Court instruction" stating that it will defer ruling on the second motion to reconsider in light of Ms. Kelly's appeal of the order dismissing the Fourth Kelly Case.  Ms. Kelly then filed a third motion to reconsider, which included a request for an enlargement of time to file the list of her 20 largest unsecured creditors, filed the Fifth Kelly Case the next day, and thereafter withdrew the third motion to reconsider.

If she had been acting in good faith, Ms. Kelly would have taken the easiest, most direct, and most impactful path to prosecuting the Fourth Kelly Case – she would have filed the list of her 20 largest creditors and continued with the case.  Instead, she filed three motions to reconsider and an appeal.  Ms. Kelly then used the filing of the Fifth Kelly Case as an excuse for not complying with the filing requirements in the appeal despite being told previously by the Maryland District Court that the automatic stay does not operate as a stay under such circumstances.

### d.     <u>Ms. Kelly's bad faith in her current bankruptcy case</u>

The Court finds Ms. Kelly's conduct in connection with this bankruptcy case particularly offensive to the bankruptcy process.  Once again, notwithstanding this Court's eligibility opinion in the First Kelly Case which thoroughly analyzed Chapter 13 eligibility, admonished Ms. Kelly for failing to exercise reasonable diligence in completing her bankruptcy schedules, and unequivocally rejected Ms. Kelly's attempt to challenge Specialized Loan Servicing's debt and lien, Ms. Kelly filed this bankruptcy case with a petition for relief under Chapter 13 even though there is no question that she is not eligible (as discussed above) and demonstrated her continued

bad faith by failing to exercise even a modicum of diligence in completing her schedules. Ms. Kelly's schedules in this case suffer from the very same deficiencies discussed by this Court in the memorandum opinion in the First Kelly Case.

As discussed in more detail above, Schedule D offers duplicitous reasons there are no secured claims, and Schedule E/F lists 47 general unsecured claims with all but six listed at $1.00, all 47 claims listed as "unliquidated" and "disputed," and 36 claims also listed as "contingent." According to Ms. Kelly's Schedules D and E/F – executed under penalty of perjury – the claims against Ms. Kelly total $5,169.73. For the reasons set forth in the discussion on Ms. Kelly's Chapter 13 eligibility, the Court concludes that noncontingent, liquidated claims total $7,238,465.50. Through the schedules, Ms. Kelly demonstrates an audacious disregard for this Court's prior decision and the bankruptcy process.

Ms. Kelly's contention that there are no secured claims and her continued challenge to the secured claim of Specialized Loan Servicing is particularly disturbing. In its eligibility memorandum opinion in the First Kelly Case, the Court recites that, on September 10, 2015, the Florida State Court entered a 45-page judgment in which it determined that Specialized Loan Servicing holds a lien against the Naples Property in the amount of $2,753,490.90 plus interest. *In re Kelly*, 18-13244-WIL, 2018 WL 4354653, at *3 (Bankr. D. Md. Sept. 11, 2018).[24] The memorandum opinion also states that the Second District Court of Appeal of Florida affirmed the judgment of the Florida State Court. *Id.* Based on the affirmed Florida State Court judgment, this Court concluded in the First Kelly Case that Specialized Loan Servicing has a secured claim

---

[24] At the time, the lienholder was referred to as U.S. Bank. A copy of the Florida State Court's judgment was attached to the proof of claim filed by Specialized Loan Servicing in the First Myers Case [Claim No. 12-1] and was also attached to a memorandum that Specialized Loan Servicing filed in support of the Chapter 13 Trustee's motion to dismiss the First Kelly Case [First Kelly Case, Dkt. No. 57].

against the Naples Property.  *See* Trans. of Hearing [First Kelly Case, Dkt. No. 104], at p. 6; *see also In re Kelly*, 2018 WL 4354653, at *3.  Notwithstanding the final determinations by the Florida State Court and this Court that Specialized Loan Servicing has a valid lien against the Naples Property, Ms. Kelly continues to contest its claim and lien.

Moreover, Ms. Kelly's opposition to the Motion to Dismiss deceptively states that the appeal pending in the Fourth Myers Case related to Specialized Loan Servicing's claim is a "lien avoidance action."  As previously explained, the appeal concerned funds being held in this Court's Registry in connection with the First Myers Case.  The Florida Bankruptcy Court determined that the funds are not encumbered by a judicial lien in favor of Specialized Loan Servicing, and the Florida District Court affirmed that decision.  The appeal has no bearing whatsoever on Specialized Loan Servicing's lien against the Naples Property.  These misstatements and baseless assertions are more evidence of Ms. Kelly's bad faith.

Ms. Kelly's proposed Chapter 13 plan also reeks of bad faith.  The plan proposes to pay $150.00 per month for a term of 36 months for total funding of $5,400.00 and states that creditors will be paid 100% of their claims through her Chapter 13 plan.  However, for the plan to be confirmable, it must pay all prepetition arrears owed, and U.S. Bank alleges in its claim that Ms. Kelly owes prepetition arrears of $1,283,051.28.  The proposed distribution of $5,400.00 in Ms. Kelly's plan falls woefully short of that amount and can hardly be considered to have been filed in good faith.

e.    **Objective futility of this case and Ms. Kelly's subjective intent**

Despite being in bankruptcy for over eight years and filing nine bankruptcy cases, Ms. Kelly or Mr. Myers have made no meaningful attempt to confirm a plan or pay their creditors. Instead, they have demonstrated a complete lack of intent to reorganize.

"To determine whether or not there has been an abuse of the provisions, purpose or spirit of Chapter 13, the court will look to the factors announced in *Neufeld*, as well as the objective futility standard and subjective intent standards pronounced in the dismissal context in the chapter 11 *Carolin Corp.* decision." *Mark*, 336 B.R. at 265-267.

To grant the NBC Entities' Motion to Dismiss on the ground that Ms. Kelly filed this case in bad faith, the Court must consider the totality of the circumstances and find objective futility and subjective bad faith here. *Carolin Corp. v. Miller,* 886 F.2d at 701–02. Objective futility requires the Court to determine whether there is any "hope of rehabilitation except according to [Ms. Kelly's] 'terminal euphoria' [.]" *Id.* at 701–02 (citation omitted). The subjective inquiry into bad faith is "designed to ensure that [Ms. Kelly] actually intends 'to use the provisions of [the Bankruptcy Code] ... to reorganize or rehabilitate.'" *Id.* at 702 (citation omitted). The "aim is to determine whether [Ms. Kelly's] real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the [bankruptcy process] merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities.'" *Id.* (citation omitted).

In making this determination, the Court must consider Ms. Kelly's employment history, unsecured claims, past bankruptcy filings, honesty in the schedules, any exceptional circumstances facing the debtor, what changes had occurred, the economic basis for the current case, the motivation of the debtor in the current case, and the prepetition conduct of the debtor. *Neufeld v. Freeman,* 794 F.2d 149, 152-53 (4th Cir. 1986) (reviewing good faith in a Chapter 13 case and citing *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir. 1982)). The "ultimate purpose" of the Court's review is "to determine whether or not, considering 'all militating factors,' there has been 'an abuse of the provisions, purpose, or spirit' of Chapter 13 in the proposal or plan." *Neufeld v.*

*Freeman,* 794 F.2d at 152 (quoting *Deans v. O'Donnell,* 692 F.2d at 972). This Court adopted *Carolin Corp. v. Miller* and *Neufeld v. Freeman* in *In re Mark,* 336 B.R. 260, 265-267 (Bankr. D. Md. 2006).

This case is objectively futile. There is not even an iota of hope for rehabilitation here. Ms. Kelly's proposed plan states she will pay $150.00 per month for a term of 36 months, providing total funding of $5,400.00 over the lifetime of the plan. However, for the plan to be confirmable, it must pay all prepetition arrears owed, and U.S. Bank alleges in its claim that Ms. Kelly owes prepetition arrears of $1,283,051.28. The plan's proposed funding of $5,400.00 falls far short of the amount necessary to pay U.S. Bank's prepetition arrears let alone pay all general unsecured creditors in full as stated in the plan. Moreover, the plan is not confirmable under Section 1325(a)(3) because it was not proposed in good, the plan does not treat secured claims as required by Section 1325(a)(5), and Ms. Kelly did not file the case in good faith under Section 1325(a)(7). It is also questionable whether the plan is feasible as required by Section 1325(a)(6). Because it is inconceivable that Ms. Kelly will ever confirm a plan in this case, especially now that Ms. Kelly has moved to voluntarily dismiss the case, the case is objectively futile.

Even more compelling is the complete and utter lack of any intent to use the bankruptcy process for the purpose for which it was intended, *i.e.*, to reorganize or rehabilitate. As discussed in painstaking detail above, Ms. Kelly filed this case as part of her and Mr. Myers' ongoing scheme to frustrate, hinder, and delay creditors and to cause creditors as much pain as possible along the way. This case is just the latest leg in a long journey designed to exploit and subvert the bankruptcy process. Ms. Kelly is anything but an "honest but unfortunate debtor" that the bankruptcy laws were designed to protect. *Marrama*, 549 U.S. at 372–74.

### f.    Ms. Kelly's continued attempts to relitigate regarding the Lot 6 proceeds

On April 30, 2021, this Court issued the Lot 6 Memorandum in the First Myers Case [First Myers Case, Dkt. No. 944] to all parties in interest and specifically included Ms. Kelly.  The Lot 6 Memorandum provides a detailed analysis of prior findings made by this Court and the Maryland District Court related to the distribution of proceeds generated from the sale of a parcel of real property known as Lot 6 during the First Myers Case.  Pursuant to a status report [First Myers Case, Dkt. No. 930] filed by the Myers Chapter 7 Trustee in that case (which remains pending), net proceeds from the sale of Lot 6 in the amount of $1,110,247.01 were turned over to the Myers Chapter 7 Trustee in Mr. Myers' pending Chapter 7 case.  Of that amount, $525,000.00 was paid to Offit Kurman as part of a court-approved settlement agreement and $197,813.40 was paid to Mr. Myers' former bankruptcy counsel, leaving a balance of $387,433.61.  Of the undistributed balance, $210,116.27 has been earmarked for payment to the Myers Chapter 7 Trustee as part of the court-approved settlement agreement with Offit Kurman, and $22,391.55 has been earmarked for payment to the Seaside Town Council as part of the Seaside consent order.[25]  That leaves unallocated proceeds of $154,925.68 that are awaiting the outcome of certain state court litigation.

For several years after the Court authorized the sale of Lot 6 pursuant to a motion filed by Mr. Myers in the First Myers Case, Ms. Kelly and Mr. Myers maintained that they had an interest in the Lot 6 Proceeds that was superior to all other interests in the funds.  As detailed in the Lot 6 Memorandum, their challenges to the proposed distribution of the Lot 6 Proceeds by the Myers Chapter 7 Trustee were numerous, repetitive, and without merit.  In an attempt to put an end to all

---

[25] The Myers Chapter 7 Trustee's fees are most certainly even higher now than they were then.  One can safely assume the funds earmarked to pay his fees are insufficient to pay him in full.

litigation surrounding the Lot 6 Proceeds, this Court issued the Lot 6 Memorandum in which the

Court stated:

> To be clear, [Mr. Myers'] undivided 100% interest in the Lot 6 sale
> proceeds and any other entireties property is property of
> his bankruptcy estate, this Court has jurisdiction over all property of
> [Mr. Myers'] estate, [Mr. Myers'] entireties property may be
> administered by the Trustee for the benefit of tax claims and joint
> claims (regardless of whether the claimholders have a judgment or
> lien), [Mr. Myers'] entireties property may not be exempted to the
> extent of any tax claims and joint claims, and [Mr. Myers']
> exemption applies only to entireties property that remains after the
> payment of all secured, tax and joint unsecured claims.

Lot 6 Memorandum [First Myers Case, Dkt. No. 944], at p. 3.  The Lot 6 Memorandum proceeded

to detail the numerous times that Ms. Kelly and/or Mr. Myers challenged those findings and

concluded that any further litigation of those issues are barred by various preclusive doctrines,

including collateral estoppel, judicial estoppel, and equitable estoppel.  Lot 6 Memorandum, at pp.

6-8.  The Lot 6 Memorandum concludes with the following findings:

> The barrage of litigation commenced by [Mr. Myers] and/or Ms.
> Kelly, the frequent filing then withdrawal of motions and appeals by
> them and the dilatory tactics exhibited by them make clear that [Mr.
> Myers], and possibly Ms. Kelly, are engaged in a bad faith scheme
> to delay the administration of [Mr. Myers'] bankruptcy estate.
>
> *      *      *
>
> [Mr. Myers] has shown a pattern of abusive litigation tactics, and
> whether willfully or innocently, Ms. Kelly has been a participant in
> the same pattern and scheme.
>
> The bankruptcy process is designed to help the honest but
> unfortunate debtor.  Its purpose is to provide a fresh start to a debtor
> while maximizing the return to creditors and balancing the interests
> of all parties in interest.  [Mr. Myers] voluntarily sought relief under
> the Bankruptcy Code, and this Court will give him every reasonable
> opportunity to get a fresh start.  However, this Court will not allow
> him or anyone else to pervert the process or flout the law.  The
> Trustee has an obligation to expeditiously administer this estate, and
> his efforts have been repeatedly hampered by [Mr. Myers] and Ms.
> Kelly's vexatious filings.

> Any further motions by [Mr. Myers], Ms. Kelly or anyone else seeking to relitigate the Entireties Issues, absent a change in the current circumstances, will be taken by this Court as an act of bad faith and will be met with appropriate sanctions. The Court has the inherent authority to regulate the behavior of those appearing before it and will not tolerate the continued pursuit of matters previously litigated and/or denied. The Court is giving [Mr. Myers] and [Ms.] Kelly an opportunity to put this conduct behind them, and the Court sincerely hopes they take it.

Lot 6 Memorandum, at pp. 11-12.

Despite this clear and unambiguous warning about future challenges to the Lot 6 Proceeds, and despite the Myers Chapter 7 Trustee's detailed report regarding the distribution of the Lot 6 Proceeds, Ms. Kelly scheduled the Lot 6 Proceeds as an asset on her Schedule A/B in the amount of $1,110,247.01. Similarly, Mr. Myers argued at the dismissal hearing that the Lot 6 Sale Proceeds were exempt, never became property of the First Myers Case, and were illegally and improperly administered by the Myers Chapter 7 Trustee. Ms. Kelly's and Mr. Myers' complete disregard for the findings and warnings set forth in the Lot 6 Memorandum demonstrates their arrogance and contempt for this Court's authority.

### g.   Volume of litigation by Ms. Kelly

The facts recounted above underscore the harassing, contemptuous nature of Ms. Kelly and Mr. Myers exhibited in their numerous bankruptcy cases and related appeals – the vast majority of which were dismissed for their failure to comply with filing requirements or voluntarily after staving off a foreclosure sale.[26] This Court and the Maryland District Court have repeatedly concluded that Ms. Kelly's and Mr. Myers' dereliction in prosecuting their cases reflects no interest in resolving matters on the merits.

---

[26] The Court includes Mr. Myers here because he and Ms. Kelly often file joint or parallel appeals.

Aside from the numerous bankruptcy cases and appeals referenced herein, Ms. Kelly's Addendum A filed with her bankruptcy schedules lists 15 lawsuits in various courts to which Ms. Kelly is a party, 11 of which are pending in various state courts.  Further, as stated in the Myers Dismissal Memorandum entered by the Florida Bankruptcy Court, Mr. Myers filed an addendum to his schedules in that case stating that Mr. Myers "held claims against a list of 43 named parties (including the Myers Chapter 7 Trustee, attorneys, and law firms in his pending Maryland bankruptcy case), and that he was a party or intervenor in 19 lawsuits pending in Maryland, Florida, and the Fourth Circuit Court of Appeals."  Myers Dismissal Memorandum, at p. 3.  The sheer number of lawsuits and parties against whom Ms. Kelly and Mr. Myers assert claims is astounding.

Ms. Kelly and Mr. Myers have systematically and abusively filed bankruptcy cases to stay ongoing litigation and appeals in various court systems.  They often oppose efforts by creditors to obtain relief from the automatic stay to allow litigation to continue to final judgment, appeal any adverse rulings, and then start the cycle all over again once the appeal is dismissed or voluntarily withdrawn.  This interminable pattern of litigious behavior holds creditors hostage to numerous judicial processes and forces them to incur legal fees to defend against frivolous lawsuits.

### 5.    Dismissal of this case with four-year bar to refiling due to Ms. Kelly's bad faith

The Court finds that the factors set forth above are more than what is necessary to establish the requisite bad faith to dismiss this case with a bar to refiling for four years.  The totality of the circumstances leads to the inevitable conclusion that Ms. Kelly has abused the provisions, purpose, and spirit of Chapter 13 and this case must be dismissed with prejudice.  The endless loop of bankruptcy filings and appeals by Ms. Kelly and Mr. Myers has made it impossible for creditors to execute on their security interests, enforce their judgments, obtain final judgments and/or orders

in litigation, or get paid through a successful bankruptcy plan. Ms. Kelly and Mr. Myers have proven that they can thwart creditors' efforts to enforce their claims for years on end. A scorching example of the extraordinary success enjoyed by Ms. Kelly and Mr. Myers is the fact that they have not made any mortgage payments to U.S. Bank since February 2010 – almost 14 years – and U.S. Bank still has not been able to complete a foreclosure sale. The Court finds no choice but to cut off one avenue of endless litigation by limiting Ms. Kelly's ability to seek bankruptcy relief for a period of time that will afford creditors real relief.

The order entered contemporaneously herewith will dismiss this case effective immediately upon entry of the order and will prohibit Ms. Kelly from filing another bankruptcy case in any jurisdiction of the United States effective immediately upon entry of the order and continuing for a period of four years after the date that the order becomes final and nonappealable (*i.e.*, the date that is four years after the date that any appeals related to this Order are finally resolved) pursuant to Section 105(a). The order will also provide that the filing of a bankruptcy case by Ms. Kelly prior to the expiration of the four-year time bar will not cause the automatic stay to become operative and will not, therefore, provide grounds to stop any scheduled foreclosure sale or other court proceeding with respect to any property owned and/or occupied by Ms. Kelly at that time.

Because Ms. Kelly and Mr. Myers have demonstrated that they can manipulate the litigation process so that its take several years to obtain a final order, the Court finds it necessary and appropriate for the bar to refiling to be for four years after the date that the order becomes final and nonappealable. Thus, the four-year time period will not begin to run until after Ms. Kelly and Mr. Myers have exhausted all of their appeals with regard to this Court's dismissal order. Although this Court is unable to protect creditors from the multitude of frivolous motions and appeals that

will surely follow in other courts (such as the Maryland State Court presiding over the Foreclosure Litigation and Contract Litigation, the Florida State Court presiding over the Naples Property foreclosure case, and the Florida State Court presiding over the Naples Litigation), the four-year bar will at least give parties in litigation with Ms. Kelly a fighting chance to pursue and complete their litigation and will give creditors an opportunity to assert and enforce their claims before Ms. Kelly is able to file another bankruptcy case.

Ms. Kelly cannot escape a lengthier bar to refiling simply by requesting voluntary dismissal of this case. Mr. Myers argued at the dismissal hearing that the Court has already determined that dismissal of this case is subject to the 180-day bar to refiling set forth in Section 109(g)(1) and that the Court is unable to impose a longer bar. He is incorrect.

Section 109(g) provides for an automatic 180-day bar to refiling under certain circumstances:

> Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—
>
> (1) the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or
>
> (2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.

11 U.S.C. § 109(g). When the Court entered an order granting Ms. Kelly a 14-day extension of the deadline to file her required documents [Dkt. No. 12], the order stated:

> DEBTOR IS HEREBY NOTIFIED that failure to complete the required filings within the extended time allowed by this Order may result in dismissal of this case. **If this case is dismissed it will be with a 180-day bar to refiling pursuant to 11 U.S.C. § 109(g)(1)** [emphasis in original].

Mr. Myers claims the 180-day bar applies to any dismissal of this case because of the language in the extension order. To the contrary, the 180-day bar described in the order would have been triggered only if this case were being dismissed for Ms. Kelly's failure to file required documents by the deadline set forth in the order, *i.e.*, for the "willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case." 11 U.S.C. § 109(g)(1). Ms. Kelly filed all required documents. Accordingly, this case is not being dismissed for her failure to abide by an order of the Court and the dismissal is not limited to a 180-day bar to refiling.[27]

As discussed in Section III.C.3. above, Sections 105(a) and 349(a) authorize the Court to bar refiling of a bankruptcy case in excess of 180 days for cause. Section 105(a) grants this Court authority to issue any order "that is necessary or appropriate to carry out the provisions of this title" and to "tak[e] any action or mak[e] any determination necessary or appropriate … to prevent an abuse of process." 11 U.S.C. § 105(a). Section 349(a) authorizes the Court to, among other things, "prejudice the debtor with regard to the filing of a subsequent petition under this title" if cause exists to do so. 11 U.S.C. § 349(a). If ever there were a case that screams out for the extraordinary relief allowed by Sections 105(a) and 349(a), this is it.

### D. Relief From Automatic Stay With Prospective Relief Under Sections 105(a), 362(d)(1), and 1301(c)

#### 1. Relief from automatic stay for cause for NBC Entities and U.S. Bank under Section 362(d)(1)

Both the NBC Entities and U.S. Bank request relief from the automatic stay pursuant to Section 362(d)(1), which provides that "the court shall grant relief from the stay provided under

---

[27] The Court notes that, had the issue of bad faith not been presented, the 180-day bar to refiling provided in Section 109(g)(2) would have been triggered notwithstanding the extension order because Ms. Kelly filed her request to voluntarily dismiss this case after the filing of a motion for relief from the automatic stay.

subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay … for cause." 11 U.S.C. § 362(d)(1). "Proof of a debtor's bad faith may serve as grounds for cause sufficient to warrant relief from stay." *In re Ford*, 522 B.R. 829, 836 (Bankr. D.S.C. 2014). "The Court has broad discretion in determining whether cause exists under § 362(d)(1), including on the grounds of bad faith, and must make such determinations on a case-by-case basis, considering the totality of the circumstances." *Id.*

Ms. Kelly's bad faith conduct (discussed in detail in Section III.C.4. above) constitutes cause for relief under Section 362(d)(1). Consequently, the Court will modify the automatic stay to permit the NBC Entities to fully and finally pursue their legal rights to dispose of all of the matters arising from or relating to the Naples Litigation and to liquidate their claim for costs awarded against Ms. Kelly and Mr. Myers in connection with the Naples Litigation. The Court will also modify the automatic stay for cause and modify the co-debtor stay (to the extent it applies) to avoid irreparable harm to permit U.S. Bank to exercise its legal rights under applicable law as to the Bethesda Property, including but not limited to foreclosure against the property.

### 2. Prospective relief from automatic stay as to Naples Litigation and Ms. Kelly's real property under Section 105(a)

Moreover, for all the reasons stated above regarding the four-year bar to Ms. Kelly's refiling of a bankruptcy case, it is necessary and appropriate to protect creditors by granting prospective relief from the automatic stay for four years. The Court will grant such relief pursuant to Section 105(a) so that the automatic stay imposed by Section 362(a) shall not apply to the Naples Litigation in any bankruptcy case filed in any jurisdiction of the United States by Ms. Kelly. The automatic stay also shall not apply to any real property in which Ms. Kelly has an ownership and/or possessory interest in any bankruptcy case filed in any jurisdiction of the United States by any individual and/or entity asserting an interest in any of the properties. For the same reasons as set

forth above, the Court will grant this prospective relief from the automatic stay for a period of four years after the order becomes final and nonappealable.

### 3.    Relief from co-debtor stay as to Mr. Myers under Section 1301(c)

U.S. Bank requests relief from the co-debtor stay imposed by Section 1301(a), which provides that "after the order for relief under this chapter, a creditor may not act, or commence or continue any civil action, to collect all or any part of a consumer debt of the debtor from any individual that is liable on such debt with the debtor, or that secured such debt" (except in circumstances that do not apply here).  11 U.S.C. § 1301(a).  A party in interest may obtain relief from the co-debtor stay "to the extent that … the plan filed by the debtor proposes not to pay such claim [or] such creditor's interest would be irreparably harmed by continuation of such stay."  11 U.S.C. § 1301(c)(2) and (3).

Based on the evidence introduced, it appears that Mr. Myers is not an obligor under the note to U.S. Bank.  If that is the case, the co-debtor stay does not apply to Mr. Myers with respect to that debt.  However, to the extent that the co-debtor stay may apply (as asserted by Mr. Myers), the Court will grant U.S. Bank relief from the co-debtor stay under Section 1301(c)(2) and (3) because Ms. Kelly's plan does not propose to pay U.S. Bank and, for the reasons discussed above, U.S. Bank's interest would be irreparably harmed by continuation of the stay and further delay.

### 4.    Equitable servitude against Ms. Kelly's properties under Section 105(a)

As contemplated by the Court's June 1, 2023 order, the Court will impose an equitable servitude on all real property in which Ms. Kelly has an ownership and/or possessory interest for a period of four years after the order imposing the equitable servitude becomes final and nonappealable.  Again, to be clear, the equitable servitude will take effect immediately upon entry of the order and will continue until four years after all appeals of the order have been exhausted

and the order becomes final.  According to her schedules, Ms. Kelly has an ownership interest in five properties:  (i) 750 Gulf Shore Boulevard North, Naples, FL 34102; (ii) 4505 Wetherill Road, Bethesda, MD 20816; (iii) 147 Silver Laurel Way, Santa Rosa Beach, FL 32459; (iv) Lot 13/Seaside 15 Subdivision, XXX Wakula Lane, Santa Rosa Beach, FL 32459; and (v) the lot located at The Villages at Seagrove PUD, Santa Rosa Beach, FL 32459 (the "Kelly Properties").

The effect of the equitable servitude is that the automatic stay in a subsequent case filed by a person with an interest in any of the Kelly Properties will not take effect while the equitable servitude is in place and will not interfere with a foreclosure of any of the Kelly Properties.  The Court grants this extraordinary relief pursuant to Section 105(a) to prevent further abuse of the bankruptcy process by Ms. Kelly.  *See generally In re Yimam*, 214 B.R. 463, 466-67 (Bank. D. Md. 1997) (imposing an equitable servitude as to real property owned by debtor and spouse and holding that "this court has the power and the duty to implement an appropriate order to prevent the continuing abuse of the bankruptcy process by the [debtors]"); *In re Muhaimin*, 343 B.R. 159, 173 (Bankr. D. Md. 2006) ("[R]elief under *Yimam* is not superseded by BAPCPA § 362(d)(4), but rather survives and co-exists *in pari materia* with it, as an alternative remedy available to creditors dealing with serial bankruptcy filers."); *In re Henderson*, 395 B.R. 893, 901 (Bankr. D.S.C. 2008) ("This Court may also *sua sponte* take action to prevent abuse of process, including granting a creditor *in rem* relief.").

Mr. Myers argued at the dismissal hearing that *Alvarez v. HSBC Bank USA, N.A. (In re Alvarez)*, 733 F.3d 136 (4th Cir. 2013) precludes this Court from entering any type of order affecting property owned by Ms. Kelly and Mr. Myers as tenants by the entireties because such property is not subject to the jurisdiction of this Court.  Mr. Myers' reliance on *Alvarez* is misplaced.  *Alvarez* dealt with a Chapter 13 case filed by only one spouse who attempted to strip

off a valueless lien on property that the debtor and his non-debtor spouse owned as tenants by the entireties.  The Fourth Circuit set forth the well-established principles of Maryland law regarding entireties ownership and explained:

> When an individual files a bankruptcy petition, a bankruptcy estate is created by operation of law.  11 U.S.C. §§ 301, 541(a).  Subject to some exceptions not relevant here, 11 U.S.C. § 541 mandates that a debtor's bankruptcy estate contain "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  Thus, under this provision, a debtor's undivided interest in entireties property is part of that debtor's bankruptcy estate.  *In re Ford,* 3 B.R. 559, 571 (Bankr. D. Md. 1980), *aff'd sub nom. Greenblatt v. Ford,* 638 F.2d 14 (4th Cir. 1981).

*Id.* at 141.

The Fourth Circuit stated that that when an individual who owns property as tenants by the entireties files for bankruptcy, the asset that becomes a part of the bankruptcy estate is only the debtor's interest as it existed immediately before the commencement of the case – his individual undivided interest as a tenant by the entirety.  *Id.*  The Fourth Circuit further explained that the filing of the bankruptcy petition by one spouse does not sever the unities of a tenancy by the entirety and, therefore, "under our precedent and in accordance with principles of Maryland law, only [the debtor's] interest in the entireties property, and not the whole of the entireties property owned by the marital unit, became part of his bankruptcy estate."  *Id.* (citing *Greenblatt*, 638 F.2d at 14-15).  Ultimately, the Fourth Circuit affirmed the bankruptcy court's determination that a bankruptcy court lacks authority to modify a lienholder's rights with respect to a non-debtor's interest in property owned as tenants by the entireties.  *Alvarez*, 733 F.3d at 142.

The underlying principle of *Alvarez* and *Greenblatt* is that the filing of a bankruptcy petition by one spouse does not sever the tenancy by the entireties.  Rather, the debtor's undivided interest in entireties property is property of the bankruptcy estate and that interest may be exempted from property of the estate pursuant to Section 522(b)(3)(B).  *Alvarez*, 733 F.3d at 142.  Here, the

Court is not taking any action that affects the ownership of Ms. Kelly's and Mr. Myers' property, nor is the Court determining that a trustee may administer exempt property. Rather, the Court is limiting the protections of the automatic stay of Section 362(a) in any future bankruptcy case filed by anyone with an interest in any of the Kelly Properties.

The equitable servitude means that Ms. Kelly and any individuals and/or entities with an interest in any of the Kelly Properties will be precluded from taking advantage of the automatic stay of Section 362(a) in any bankruptcy case filed between now and four years after the order imposing the equitable servitude becomes final and nonappealable. As this Court said in *Yimam*, this Court has not only the power but also the duty to enter orders that prevent the continuing abuse of the bankruptcy process by a debtor. *Yimam*, 214 B.R. at 466. The Court concludes that the relief imposed and the time period are necessary to fulfill its duty to creditors and parties in interest in this bankruptcy case.

### 5.  Recordation of lift stay orders

Because of the *in rem* nature of the relief being provided, the Court will require that the NBC Entities and U.S. Bank record a copy of their respective lift stay orders in compliance with applicable state laws governing notices of interests or liens in real property. The NBC Entities will be directed to file their lift stay order in Collier County, Florida (where the Naples Property and the NBC Property are located), and U.S. Bank will be directed to file its lift stay order in Montgomery County, Maryland (where the Bethesda Property is located). In addition, the NBC Entities and U.S. Bank will be authorized to record their lift stay orders in any other jurisdiction in which they believe Ms. Kelly may have an ownership and/or possessory interest in real property.

To provide Ms. Kelly, Mr. Myers, and other parties in interest in this bankruptcy proceeding notice of when the lift stay orders are recorded, the Court will direct the NBC Entities

and U.S. Bank to file a certification confirming that they have recorded their respective lift stay orders within 14 days of entry of the orders.

### 6.   Waiver of 14-day stay under Bankruptcy Rule 4001(a)(3)

Bankruptcy Rule 4001(a)(3) provides that an order granting relief from the automatic stay is stayed for 14 days after entry of the order unless the Court orders otherwise.  Because of the extreme bad faith exhibited by Ms. Kelly and because the NBC Entities and U.S. Bank have been precluded from enforcing their rights for far too long, the Court will waive the 14-day stay and make the lift stay orders immediately enforceable.

## IV.   CONCLUSION

The Court takes no pleasure in imposing such extraordinary relief, but it is the duty of this Court to prevent further abuse of the bankruptcy process by Ms. Kelly.  The Court determines that the relief granted is necessary and appropriate under the unique facts of this case to protect the integrity of the Court and the bankruptcy process.  The Court will enter orders granting the NBC Entities' Lift Stay Motion, U.S. Bank's Lift Stay Motion, and the Motion to Dismiss.

cc:   Debtor – Barbara Ann Kelly (pro se), 4505 Wetherill Road, Bethesda, MD 20816
Debtor – Barbara Ann Kelly (pro se), 750 Gulf Shore Boulevard North, Naples, FL 34102
Movant – Naples Property Holding Company, LLC
Movant – Naples Beach Club Land Trust Trustee, LLC, as Trustee
Movant – Naples Beach Club Phase II and III Land Trust Trustee, LLC, as Trustee
Movant – NBC Club Owner, LLC
Movants' Counsel – Catherine K. Hopkin
Movants' Counsel – Patricia A. Redmond
Movants' Counsel – Drew M. Dillworth
Joining Party – Naples Golf and Beach Club, Inc.
Joining Party's Counsel – Jordi Guso
Movant – U.S. Bank National Association
Movant's Counsel – Daniel A. Glass
Movant's Counsel – Gregory C. Mullen
Responding Party – Roger Schlossberg, Chapter 7 trustee in Gregory Brian Myers' bankruptcy
Responding Party's Counsel – Frank Mastro, counsel for Chapter 7 trustee in Gregory Brian Myers' bankruptcy
Responding Party – Rebecca A. Herr, Chapter 13 trustee

United States Trustee – Lynn A. Kohen
Other – Gregory Brian Myers, 750 Gulf Shore Boulevard North, Naples, FL 34102
Other – Gregory Brian Myers, 4505 Wetherill Road, Bethesda, MD 20816
All creditors and parties in interest

**END OF MEMORANDUM**